THOMAS CUMMINGS *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. BEATON & ASSOCIATES, INC., Defendant (McDonald's Corporation, Defendant-Appellant and Cross-Appellee).—THOMAS CUMMINGS *et al.*, Plaintiffs-Appellants, v. BEATON & ASSOCIATES, INC., Defendant-Appellee.

First District (4th Division)   Nos. 1—91—2131, 1—91—2492 cons.

Opinion filed December 17, 1992.

288

JIGANTI, P.J., dissenting.

Foran, Wiss & Schultz, of Chicago (Thomas A. Foran, Richard G. Schultz, James R. Figliulo, and Steven H. Gistenson, of counsel), for McDonald's Corporation.

Theodore M. Becker, P.C., and Sachnoff & Weaver, Ltd., both of Chicago (Lowell E. Sachnoff, Arnold A. Pagniucci, and Jeffrey T. Gilbert, of counsel), for Thomas Cummings and Barbara Cummings.

JUSTICE LINN delivered the opinion of the court:

Plaintiffs, Thomas and Barbara Cummings, filed a six-count complaint against McDonald's Corporation and other defendants who allegedly waged a war of harassment and intimidation against plaintiffs after their company, Central Ice Cream Company, won a $52 million jury verdict in 1984 against McDonald's. The instant appeal is from one count of the complaint, which claims that McDonald's violated a written settlement agreement that would have compromised and settled all of the Cummingses' claims against McDonald's and its agents. McDonald's chairman of the board, Fred Turner, and its general counsel, Shelby Yastrow, are also named defendants. The remaining defendants are individuals and agencies or business entities who were hired to investigate the Cummingses and others at the request of McDonald's. These defendants (hereafter sometimes referred to as the non-McDonald's defendants) are Beaton & Associates, Inc.; Beaton Services, Ltd.; Financial and Technical Investigations, Inc.; Search International, Inc.; United States Security Services Corporation; International Intelligence, Inc.; John Burke; Desnoyers & Associates, Inc.; Richard M. Lucas; Alisha Ramshaw; Andrew Doppelt; David Accardi; Wallace Oshiro; and Nick Keller.

The parties filed cross-motions for summary judgment on count VI of the second amended complaint, which alleges that McDonald's had breached the 1985 settlement agreement. The court ruled in favor of the Cummingses and awarded contract damages of $4 million plus prejudgment interest of approximately $1.2 million. McDonald's appeals from both the judgment as to liability and the amount of damages. The Cummingses cross-appeal from the interest award, asserting that the trial court should have applied a higher rate of interest in its calculation. They also seek attorney

fees based on McDonald's "bad faith conduct." In addition, the Cummingses appeal from the court's separate ruling that the non-McDonald's defendants were agents of McDonald's and therefore included in the scope of the releases that were part of the settlement agreement.

We affirm the judgments in both appeals.

BACKGROUND

HISTORY OF THE ORIGINAL STATE COURT ACTION

In 1977, Central Ice Cream Company (Central) filed suit against McDonald's in the circuit court of Cook County, alleging breach of an oral contract and fraud. During the pendency of that suit, Central went into bankruptcy and the bankruptcy estate was named as an additional plaintiff in the Central litigation. Thomas Cummings was president of Central and Barbara Cummings was its secretary. Both were directors and Barbara owned substantial stock in the company. Thomas Cummings testified at length in the trial as the primary witness against McDonald's. Fred Turner, chairman of the board of McDonald's, also testified. According to Cummings, Turner was the instrumentality of the fraud.

In January 1984, the jury returned a verdict against McDonald's, awarding $52 million to Central. McDonald's filed extensive post-trial motions in the State court, challenging the verdict, and these motions were pending for almost a year. During this period, McDonald's hired private investigators who, according to the Cummingses, undertook a course of harassing conduct that was designed to coerce Thomas Cummings into agreeing to a low settlement figure and to discourage him from testifying again if a new trial were to be ordered as a result of the post-trial motions. On June 20, 1985 (June 20), one week before the State court judge was set to rule on the post-trial motions, McDonald's, Central, the bankruptcy trustee, and plaintiffs executed a written settlement agreement that would have settled all claims against McDonald's for a total of $15.5 million. As part of the agreement, the Cummingses were to net $2.6 million from a $4 million payment that included attorney fees. In exchange, the Cummingses would execute a release of their personal claims against McDonald's. The signed settlement agreement required all parties to recommend the bankruptcy court's approval of the agreement. Mutual general releases were also drawn up.

The June 20 settlement agreement was not adopted by the bankruptcy court, for reasons that will be discussed, and McDonald's was allowed to tender the full $15.5 million to the bankruptcy court in settlement of the Central litigation, without settling the Cummingses' claims. Thereafter, the Cummingses brought the pending, multiple-count lawsuit against McDonald's and the other defendants.

According to detailed allegations in the complaint, McDonald's undertook a campaign of harassment and intimidation following the Central verdict, targeting the Cummings family, their attorneys, the trial judge, and others. The record indicates McDonald's has, in fact, admitted to hiring one or more private investigation agencies to investigate the Cummingses. McDonald's contends, however, that its investigation was limited to information found in public records and did not include illegal activities.

Discovery answers in the record tend to substantiate at least some of the allegations. For example, certain of the non-McDonald's defendants admit that they were hired to conduct surveillance of the Cummingses' daughter, Lydia; that credit checks were run on various members of the family; and that at least one investigative agency was told to approach members of the Central jury. Other allegations have not been admitted, however, and we emphasize that they have not been tested and proven by a trial on the merits. We express no opinion as to the veracity of the allegations and we decline to set forth a complete listing of charges, countercharges, and defenses. Nonetheless, referring to the Cummingses' "personal claims" against McDonald's without some elaboration would be like referring to a hurricane as a weather pattern.

The Cummingses' six-count, second amended complaint states that investigators hired by McDonald's posed as members of a jury polling service and took the jurors out to restaurants in the hopes of obtaining affidavits to impeach the $52 million verdict. Uncooperative jurors were allegedly harassed with repeated telephone calls to their homes. Other allegations claim that McDonald's attorneys met with private investigators to compile extensive dossiers on the Cummingses and their personal accountant, whose office was ransacked in March 1984. After the break-in, the only file missing contained some of the Cummingses' tax returns. The complaint further alleges that McDonald's investigators also tried to find information to impugn the integrity of the circuit court judge who had presided over the Central litigation. Still other allegations include defendants' deliberate attempts to frighten Lydia Cummings through harassing telephone calls

and following her at night in a slow-moving car. One of the most serious allegations in the complaint involves an alleged murder plot against Thomas Cummings.[1]

The complaint further alleges that after Central went bankrupt Thomas Cummings was acting as a consultant for Bordens. Bordens then offered him full-time employment and agreed to let him begin after the conclusion of the Central trial. Later, however, Bordens told him he could not have the job because McDonald's had threatened to withdraw all of its business, nationwide, if Bordens hired Cummings.

Allegations like these are not the sort that normally accompany commercial litigation. We acknowledge their severity but do not wish to elevate their significance for purposes of the issues in this appeal, which are limited to the breach of settlement agreement.

THE TERMS OF THE WRITTEN SETTLEMENT AGREEMENT

The June 20 settlement agreement that is the subject of this appeal is a short document executed by the trustee in bankruptcy of the estate; Central Ice Cream Company, by its president (Thomas Cummings); the Cummingses, individually; McDonald's, by its vice-president and general counsel, Shelby Yastrow; and by the parties' lawyers. The settlement agreement states, in paragraph one, that it "shall not be effective unless and until the Bankruptcy Court *** grants the approval needed to carry out the Settlement Agreement. Upon execution of this Agreement, Bernard C. Chaitman [trustee] will petition said Court for such approval, setting forth the complete terms hereof and seeking entry of an order acknowledging all such terms and the reasonableness thereof and finding that such terms are fair, equitable and to the benefit of the Bankrupt Estate."

The second paragraph lists Central and McDonald's as parties to the Central litigation pending in the State court who have, "with the full knowledge and consent of Cummings, agreed to settle and resolve all claims and disputes of all kinds between them including all claims which have been made or could have been made in any [pleading any-

---

[1] This allegation, and the inclusion of Fred Turner's name as the person behind the threat, was raised for the first time in the second amended complaint. McDonald's objected to the filing of the second amended complaint, requesting an opportunity to disprove the allegations relating to the murder plot. The trial court ordered that the file would be impounded and the parties and their attorneys would be subject to a "gag" order. We vacated that order upon plaintiffs' appeal, however, holding that it amounted to an unconstitutional prior restraint on speech. *Cummings v. Beaton & Associates, Inc.* (1989), 192 Ill. App. 3d 792, 549 N.E.2d 634.

where at any time]. Central and McDonald's agree to execute a stipulation, in the form attached hereto as Exhibit A. Central agrees that it will cooperate fully in securing the entry of the orders provided in the stipulation."

The third paragraph concerns the personal claim of the Cummingses against McDonald's, "the validity of which has been consistently denied by McDonald's; however, McDonald's and [the Cummingses] wish to settle all potential litigation between them and put all aspects of this matter to rest so far as all are concerned."

Paragraph four of the settlement agreement provides that "Central, McDonald's, and [the Cummingses] each agree to execute forms of mutual general release on the date provided in paragraph 6, below [in the form attached as Exhibit B]."

Paragraph five recites McDonald's representation that "it has independently decided that execution and performance of this Settlement Agreement is in the best interests of McDonald's and that it will recommend approval of the Settlement Agreement without reservation." Similar language is repeated for Central and Cummings regarding their best interests and recommendations of approval of the agreement. The paragraph concludes as follows: "The parties further agree that they will support the entry of all orders needed to effectuate this Settlement Agreement."

The sixth paragraph sets forth the timing of the entry of the necessary orders, stipulations, and releases, copies of which are attached to the agreement. This provision also sets out the monetary consideration for the settlement: "McDonald's shall deliver (a) to Bernard C. Chaitman, Trustee, Central Ice Cream Company, Case No. 78 B 4820, a check, payable in the form specified by [the court], in the sum of Eleven Million Four Hundred Ninety Nine Thousand Nine Hundred Ninety Nine and Ninety Nine Cents ($11,499,999.99) and (b) to Thomas and Barbara Cummings, jointly, a check in the sum of Two Million Four Hundred Thousand Dollars ($2,400,000) and to their attorneys, the law firm of Becker & Tenenbaum and the law firm of Spence, Moriarity & Schuster, a check for One Million Six Hundred Thousand Dollars ($1,600,000) (the latter sum being forty percent (40%) of the aggregate sum of Four Million Dollars ($4,000,000))."

Paragraph seven states that the parties understand and agree that the agreement is not to be taken as an admission of the validity of any of the claims against McDonald's.

The eighth paragraph declares that each signatory has read and understood it and has been advised by counsel. The last paragraph states that the document may be executed in counterparts.

SETTLEMENT NEGOTIATIONS

While the settlement agreement did not arise in a vacuum, we believe that the negotiations leading up to its execution are of greatly limited relevance to the dispositive issues in this case. Ordinarily, our analysis would focus on the express terms of the written agreement rather than what the parties did or said before or at the time of its execution. We must discuss the negotiations, however, because McDonald's defense to the breach of contract claim rests almost entirely on those negotiations as a way of explaining or justifying what McDonald's subsequently did in the bankruptcy court to trigger that court's rejection of the June 20 settlement agreement.

Approximately one week before the trial judge in the Central litigation was set to rule on McDonald's post-trial motions, Fred Turner, McDonald's vice-president, telephoned Gerry Spence, one of the trial lawyers for Central, to discuss settlement. At stake, of course, was the $52 million jury verdict that might, or might not, survive McDonald's post-trial challenges and possible appeal. Turner offered $11 million in settlement, which was rejected, and after additional negotiations, the amount of $15.5 million was agreed upon. Because Central was in bankruptcy, any agreement was subject to bankruptcy court approval and the verdict, or settlement amount, was virtually the sole asset of the Central bankruptcy estate.

McDonald's notes that at this point in the discussion, nothing was said about the possibility of including the Cummingses' personal claims as part of the settlement (although it was assumed that the Cummingses would sign releases). According to McDonald's, their executive vice-president, Donald Horwitz, and Spence agreed to the sum of $15.5 million in settlement of the Central litigation. But when Spence related the offer to Thomas Cummings, whose signature on behalf of Central was necessary, Cummings raised some questions and Spence referred him to Central's bankruptcy lawyer. This lawyer informed Cummings he was "not going to see a penny" for his company after the claimants were through. Cummings told Spence he would not sign it because he might not get anything and that he had personal claims against McDonald's that he would not give up. Spence supposedly had a "big fight" with his client over the matter, saying he had given "his word" on the deal to Horwitz.

Spence, who represented both Central and Cummings, then came up with the idea of allocating a portion of the total settlement amount to compensate the Cummingses on their harassment claims. When Spence relayed this proposition, Horwitz "had an absolute uncon-

trolled fit" and rejected the notion of paying Cummings anything. Horwitz then threatened to take the deal directly to the bankruptcy court without the Cummingses' participation or release. Spence strongly objected, as that approach amounted to a unilateral action instead of a freely negotiated settlement of all claims.

Finally, after further discussion, the parties all signed the written agreement of June 20, which clearly and indisputably includes the Cummingses' personal claims and releases as part of the settlement package. McDonald's contends, however, that contemporaneously with the execution of the agreement, the parties orally agreed to inform the bankruptcy court about the negotiations and the fact that McDonald's was willing to tender the same amount of money to the bankruptcy estate without allocating money to the Cummingses and without obtaining their releases.

BANKRUPTCY COURT PROCEEDINGS

Central's trustee, a signatory of the contract, applied to the bankruptcy court for approval of the parties' settlement agreement. On July 9, Judge Schmetterer, the bankruptcy judge, began hearing testimony, calling as the court's first witness Theodore Becker. Becker, as special litigation counsel to the estate as well as counsel for the Cummingses, was interrogated by the court regarding the fairness of the settlement agreement, primarily in the context of whether the settlement amount reflected the best compromise of the $52 million verdict. At that point, the State court's ruling on the post-trial motions had been sealed and that ruling was to remain sealed if the parties settled the case and stipulated, pursuant to their written agreement of June 20, that judgment for McDonald's should be entered notwithstanding the verdict.[2] Because of the bankruptcy court's duty to protect the interests of creditors as well as the bankrupt estate, the court questioned Becker on July 9 about the reasons why there was an allocation of funds to the Cummingses on unspecified personal claims. Becker replied that he did not believe he could disclose the nature of

---

[2]The transcript of the July 9, 1985, bankruptcy court proceedings hints at the massive undertaking the Central litigation had become in the State court, as discovery proceeded and McDonald's zealous defenses engendered the need for more expert witnesses and additional discovery. Central's earliest, prelitigation demand for settlement of its initial claim was $600,000. After years of extensive discovery and motion practice, which forced Cummings to find investors to finance the litigation expenses, the parties underwent a 13-week trial, reportedly the longest ever in Cook County at the time. The resulting $52 million verdict was also reported to be the largest verdict returned at that time.

the claims without violating the State court's order that had expunged the allegations from the record. Upon further questioning, Becker explained that he had appeared before Judge Norman in May of 1984 and March 1985 to complain of McDonald's misconduct in the wake of the jury's verdict. During that time period the post-trial motions were still pending before Judge Norman, and he ordered the allegations expunged from the record because they related to matters outside of the issues pending before him. Judge Schmetterer ordered Becker to deliver to his chambers a sealed copy of the expunged material. The judge also expressed concern that Becker and Spence might be in a conflict of interest situation with respect to their representation of the Cummingses personally in addition to Central.

At the end of the bankruptcy court session on July 9, 1985, Judge Schmetterer had not finished questioning Becker and had not made any ruling as to the Cummingses' portion of the settlement agreement. The next day, however, June 10, attorney Fred Lane presented a letter to Judge Schmetterer at the beginning of court, on McDonald's behalf. In the letter, Lane claimed that parts of Becker's testimony were untrue. He also assured the bankruptcy court judge that "the expunged personal statements about Mr. Turner were irrelevant to the settlement discussions," contrary to Becker's representations. Lane's letter also stated that McDonald's was not seeking the Cummingses' release as a condition of the settlement. The remainder of the letter purports to explain (or contradict) much of the written settlement agreement by taking issue with Becker's June 9 testimony as to whose idea it had been to allocate money to the Cummingses in exchange for their release of the personal claims. The letter concluded, "McDonald's position remains unchanged. It does not care how the $15,500,000 is allocated so long as a judgment notwithstanding the [$52 million verdict] is entered in the Circuit Court litigation and McDonald's receives appropriate releases from the Trustee on behalf of Central."

Judge Schmetterer questioned Lane, who advised the court that the alternative McDonald's proposal "[was] something that [had] *always* been available." (Emphasis added.) Understandably, Judge Schmetterer then concentrated on the prospect of having the full $15.5 million settlement reserved for Central's bankrupt estate, thus separating the estate claims from the Cummingses' personal claims. The court requested the trustee to amend the application to eliminate the allocation of money to the Cummingses as well as their release of personal claims. In the amended settlement agreement, dated July 23, 1985, McDonald's insisted on including a specific proviso that required

the court to enter an order rejecting the June 20 settlement agreement.

OPINION

APPEAL No. 1—91—2131

I

### BREACH OF THE SETTLEMENT AGREEMENT

The simple question is whether, after executing a written agreement to compromise and settle a $52 million jury verdict entered against it, as well as the separate claims of the Cummingses, McDonald's violated the agreement in the bankruptcy court by encouraging its rejection in favor of a different settlement. Both sides moved for summary judgment in their favor, arguing that the case involves no genuine issue of material fact in dispute. Both sides draw opposing legal conclusions from those facts, however. Much of McDonald's argument focuses on the presettlement negotiations: who represented what to whom at what point and for what reasons. In fact, McDonald's implies that the written agreement itself was never more than a bare proposal to the bankruptcy judge, instead of a formal compromise and settlement among the parties to the controversy.

To the extent McDonald's admits repudiating the settlement agreement in the bankruptcy court, it argues that its conduct was not only justified but mandated by ethical concerns and thus immune from liability. The Cummingses, in contrast, view the same conduct as a breach of contract that cannot be covered over by allusions to ethics and public policy. For our part, we face a mountain of "undisputed" facts, surrounded by a moat of legal arguments. Fortunately, the trial judge in this case crossed the moat and climbed the mountain, leaving us a trail with major signposts along the way.

### A. "FULL DISCLOSURE" OF SETTLEMENT NEGOTIATIONS

█ In our view, even if McDonald's was at all times ready, willing, and able to settle with Central alone, it is the parties' written agreement of June 20 that controls on the issue of what the final agreement was *as to the Cummingses' claims*. Nothing on the face of the agreement is ambiguous regarding the parties' intention to settle the Cummingses' claims as set forth, along with the Central litigation. (See *Dayan v. McDonald's Corp.* (1985), 138 Ill. App. 3d 367, 485 N.E.2d 1188 (most reliable indicator of parties' intent is the language

they use in their contract) (affirming grant of defendant's motion for summary judgment that Illinois law governed franchise agreement).) McDonald's nonetheless insists that the June 20 written agreement was conditioned on an *oral agreement* of the parties to advise the bankruptcy court of all the negotiations that had occurred, especially the fact that McDonald's had been willing and remained willing to pay the $15.5 million settlement amount to Central alone, without the Cummingses' personal releases.

The Cummingses term this argument "preposterous," noting that there would be little point in executing a written settlement agreement if one of the parties could unilaterally repudiate or alter its terms under the guise of "disclosing" earlier negotiations and alternative, rejected proposals to the bankruptcy court. See, *e.g., Chicago Title & Trust Co. v. Cohen* (1936), 284 Ill. App. 181, 194, 1 N.E.2d 717, 722 (When a contract on its face denies the existence of a condition, "or where by necessary implication such condition is impossible, then to permit parol proof to the contrary would not only vary, but destroy the agreement").

## B. EFFECT OF LANE'S APPEARANCE ON THE JUNE 20 SETTLEMENT

The record shows that Becker, on July 9, had been answering the judge's questions regarding the June 20 agreement, testifying as the court's first witness. He stated that much of the pre-agreement negotiations had taken place between Spence and Horwitz. Becker's understanding from what Spence had told him was that McDonald's had insisted on obtaining the Cummingses' personal release of claims and that McDonald's had made the allocation of the amounts that appeared in the June 20 agreement. (In later testimony, Spence clarified certain points from his personal knowledge. We do not regard as material the discrepancies in testimony as to what was said when and by whom during negotiations. Nonetheless, we adopt McDonald's chronicle of the sequence of negotiations for purposes of this appeal from summary judgment.) Becker also explained to the court at that time that he did not feel he could disclose the nature of the personal claims and the material that Judge Norman had expunged in the State court. Judge Schmetterer ordered Becker to provide him with a copy of the expunged material, however, presumably to take it into account in determining whether the June 20 settlement agreement was reasonable and fair under the circumstances. Judge Schmetterer adjourned the proceedings for the day on July 9, without making any findings or legal rulings regarding approval of the settlement agreement.

The first thing that occurred when the bankruptcy court reconvened the next day was Fred Lane's presentation to the court of McDonald's "real" intentions regarding settlement. He certainly was not there to unreservedly recommend the written agreement. On the contrary, Lane intervened at a very preliminary stage in the hearing, while the court was still examining Becker. Abandoning the agreement his client had signed, Lane put forth the letter containing McDonald's "other" settlement proposal to the trustee and to the court. The letter was then attached to the trustee's application and urged upon the court as the settlement position McDonald's had "always" championed, i.e., payment of the $15.5 million to Central without any allocation to the Cummingses and without the release of their claims.

McDonald's maintains in this appeal that Lane was merely reacting to Becker's misrepresentations and correcting the record as to the actual settlement negotiations. We note, however, that McDonald's stated attempt to vindicate the "disclosure requirement" did not extend to any embarrassing allegations of McDonald's misconduct. Indeed, the very disclosures Lane wanted the court to hear operated to suppress the other disclosures that the court had ordered—the nature of the Cummingses' claims as set out in the material that had been expunged from the State court record. The Lane letter, with its recasting of McDonald's position, stopped the June 20 agreement in its tracks. As a result, the bankruptcy court no longer needed to explore the Cummingses' personal claims because McDonald's was agreeing to settle without their releases. The court was then free to accept the increased amount of funds to settle the bankruptcy estate. That is exactly what happened.

Lane's letter, and his oral statements, however, presented a settlement that was incompatible with the parties' express written agreement of June 20. As such, the Lane representations constituted a material breach of that agreement. Without a doubt, it was the parties' mutually executed agreement—not the proposal in Lane's letter—that McDonald's was contractually bound to recommend and support.

The uncontested proof of McDonald's breach of the June 20 agreement begins with the Lane letter itself, which affirms McDonald's willingness to settle with Central alone. That intention plainly contradicts the express terms of the June 20 agreement. All of the judges who have considered the matter have agreed that the Lane letter presented *different* settlement terms from those embodied in the June 20 agreement. Judge Schmetterer, who noted that Lane's appearance followed the court's request for the expunged matters, also found that Lane was "here and now tendering to offer" to change the settlement

agreement "to conform to the terms of his letter and accept releases only from Central." In a later review of the proceedings, Judge Leinenweber of the Federal district court found that McDonald's had "unilaterally offered to modify the settlement offer" on July 10 and had appeared in court to do so "voluntarily and without invitation." Judge Grieman, who reviewed the same materials and arguments in the pending litigation, concluded that the Lane letter offered the bankruptcy court "a new deal." Judge Grieman also noted that McDonald's had insisted on a provision in the amended settlement agreement of July 23 that would expressly reject the June 20 agreement.

### C. JUSTIFICATION FOR CHANGING ITS POSITION

McDonald's argues, however, that Lane's statements to the bankruptcy court were not wrongful because McDonald's was required by the contract to disclose such matters; Lane was obliged to correct Becker's misrepresentations; and his professional obligations as an officer of the court and attorney mandated his actions.

■ These stated reasons do not withstand analysis. If Lane's disclosures were "contractually required" by the June 20 agreement they should have been expressly included therein. Nothing in the agreement states that the parties would apprise the court of settlement negotiations or alternatively discussed proposals, however. The sole reference to "disclosure" in the contract refers to the terms of the written agreement itself, not some other parol deal or secret understanding or multiple choice arrangement. If we were to construe the parties' written agreement in accordance with McDonald's position, we would be creating an ambiguity where none exists.

The trial court in the pending case reviewed the entire record, including the bankruptcy court transcripts, affidavits, and pleadings, giving McDonald's "every intendment" on summary judgment. The court found inescapable the conclusion that McDonald's had withdrawn the June 20 document from bankruptcy court consideration. Instead of recommending or supporting the agreement as written, McDonald's directly contravened its terms with a letter that offered a different agreement, under the guise of "explaining" the earlier discussions or proposals. Lane thereby caused the court to adopt a different agreement from the one embodied in the June 20 document. In the pending case, the trial court reviewed McDonald's actions in the bankruptcy court in light of the express contractual provision of paragraph 5. In that paragraph, McDonald's agreed to "recommend approval of the Settlement Agreement without reservation," and to support the entry of all orders necessary to effectuate it. The trial judge

concluded, "It's just clear to me that the Lane letter did not comport with Paragraph 5 of the settlement agreement."

We agree with the trial court's interpretation. A party who reduces his understanding to a written agreement cannot change its essential terms by backpedaling and rationalizing after the fact. Parol negotiations are not on the same legal footing as executed, written agreements, for reasons firmly embedded in our contract law. (*E.g., Land of Lincoln Savings & Loan v. Michigan Avenue National Bank* (1982), 103 Ill. App. 3d 1095, 1101, 432 N.E.2d 378, 383 ("[E]vidence of prior or contemporaneous oral agreements is not admissible to vary or contradict the terms of a writing, otherwise unambiguous on its face); *Feder v. River's Edge Restaurant, Inc.* (1978), 59 Ill. App. 3d 1015, 1018-19, 376 N.E.2d 693, 695 ("[E]vidence of an oral condition precedent is inadmissible if that condition would contradict the terms of the written contract").) Here, all of the parties executed a written compromise and settlement of all their disputes. Thereafter, one party urged the bankruptcy court to adopt a different one in place of it. In so doing, McDonald's treated the writing as if it were a nonbinding suggestion entitled to no more weight than other alternative proposals. Settlements are by nature compromise positions. Once they are reduced to writing they are entitled to a degree of certainty. Therefore, in construing this unambiguous agreement of June 20 that settled the Cummingses' claims, we must exclude as immaterial the parties' prior, conflicting negotiating postures. If McDonald's had not intended to be bound, it should not have signed the agreement.

As for the ethical obligations McDonald's alludes to, we are left to wonder about their exact nature. The suggestion is that Becker, attorney for Central and the Cummingses, was concealing from the court something important about the settlement agreement. What the record reveals, however, is that it was McDonald's whose actions resulted in the concealment of information. The effect of the Lane letter was to end Judge Schmetterer's inquiry into the Cummingses' allegations that McDonald's had tampered with the jury and intimidated and investigated the Cummings family. McDonald's therefore ignores the selective nature of its "duty to disclose," which it cloaks with ethical and profession obligations. McDonald's did not feel ethically bound, apparently, to let the bankruptcy court find out the nature of the Cummingses' claims. McDonald's did not explain to the court why it had agreed to the allocation of settlement funds directly to the Cummingses in exchange for their release. Instead, McDonald's obviated the need for that inquiry by assuring the court it would settle

the Central litigation without reference to the personal claims and releases.

We also find unpersuasive the contention that Lane's letter was necessary to correct Becker's misstatements of certain details of the negotiating process. Even accepting that Becker incorrectly described the negotiations (some of which he did not directly participate in), Becker did not conceal or alter any *material term* of the June 20 settlement agreement under consideration. If it was important for the court to know whose idea it had been to include the Cummingses in the settlement, McDonald's could have offered a simple correction.

We do not suggest that parties are free to conceal material terms of their settlement agreements from a bankruptcy court judge. We acknowledge the bankruptcy court's right to inquire as to the status of negotiations or the range of possible settlement proposals. Furthermore, a settlement agreement should not be approved if it is unfair to creditors or the bankrupt estate. (*E.g., In re American Reserve Corp.* (7th Cir. 1987), 841 F.2d 159, 162.) We agree that Judge Schmetterer properly attempted to determine whether the lawyers believed that the settlement was the best one they could fashion under the circumstances. Certainly, both sides faced risks that the post-trial motions then pending before Judge Norman might be adverse to their interests.

The parties' earlier settlement *discussions*, however, were necessarily immaterial to the final bargain they struck in the written agreement. If McDonald's truly intended to recommend and support the June 20 agreement, as the parties' final agreement, it would not have offered a materially different settlement proposal to the court. Lane's recitals on July 10 not only did not recommend the June 20 agreement but actually encouraged its rejection in favor of another. Consequently, McDonald's reneged on its promise to compensate the Cummingses on their claims.

McDonald's numerous arguments in this appeal avoid the dispositive contract issue in this case: Did McDonald's recommend and support the terms of the June 20 agreement as it was bound to do under paragraph five of that agreement? Clearly, McDonald's did not. Was there a legal justification for not doing so? Under the material, undisputed facts, the answer is no. As we have found, McDonald's stated justification for its breach did not give rise to a cognizable defense based on the facts of record. McDonald's defense instead rests on an undefined "duty to disclose" the purported oral condition that runs contrary to the written agreement. We reject McDonald's attempt to craft this "duty" into an ethical mandate.

## D. PREVENTION OF THE CONTRACTUAL CONDITION

Stripped of the extended explanations of what led to the June 20 agreement, the contract itself is clear in its terms and intent. In a straightforward manner, it reveals that the signing parties intended to settle all pending and potential claims and disputes, both between McDonald's and Central and between McDonald's and the Cummingses. As for the latter inchoate claims, which arose after the Central verdict, the agreement states the intention of McDonald's and the Cummingses to "settle all potential litigation between them and put all aspects of this matter to rest so far as all are concerned." To that end, all agreed to seek the bankruptcy court's approval of the settlement sum and allocation of the money. What the bankruptcy court might then do was speculative because of factors not within the parties' control. The parties' *own* conduct, however, *was* within their control. The condition of the contract was bankruptcy court approval, which never occurred. McDonald's unequivocal repudiation of the June 20 agreement is what *prevented* the bankruptcy court from considering it as the agreement all parties were recommending and supporting.

■ When parties enter a contract that is conditioned upon the happening or nonhappening of an event, and the condition fails, generally the contract has no further effect. (See, *e.g., Grill v. Adams* (1984), 123 Ill. App. 3d 913, 917, 463 N.E.2d 896, 900 (failure of condition means contract does not take effect or that performance of party is excused).) If one party directly *causes* the condition to fail, however, the contract may be fully enforced against that party; one cannot take advantage of his own conduct and then claim that the resulting failure of the condition defeats his liability. (123 Ill. App. 3d at 918.) In *Grill v. Adams,* for example, the defendants were parties to a contract for a tax-deferred exchange of commercial real estate. Defendants, who were to select a suitable property for the exchange, declined to do so after market conditions and soaring interest rates made their agreement less favorable to them. They claimed that the failure of the condition (to locate a suitable exchange property) released their liability under the contract. The court rejected this position, holding that the condition was in the sole control of defendants, who had not used reasonable, good-faith efforts to locate a property.

Many other cases have recognized that a party who prevents the fulfillment of a condition upon which his own liability rests may not defeat his liability by asserting the failure of the condition he himself has rendered impossible. (*E.g., Foreman State Trust & Savings Bank*

*v. Tauber* (1932), 348 Ill. 280, 286, 180 N.E.2d 827; *Lukasik v. Riddell, Inc.* (1983), 116 Ill. App. 3d 339, 346, 452 N.E.2d 55; *Blackhawk Hotel Association v. Kaufman* (1981), 85 Ill. 2d 59, 65, 421 N.E.2d 166).) In application, then, the "wrongful prevention doctrine" is in the nature of an estoppel because it prohibits a party from profiting through his own wrongdoing.

The above principle of contract law is not applicable, however, to situations in which a party under no contractual obligation to perform or refrain from performing a particular act does something which incidentally operates to the disadvantage of another contracting party. McDonald's relies on cases in which the wrongful prevention doctrine was not applicable. See, *e.g., Botti v. Avenue Bank & Trust Co.* (1982), 103 Ill. App. 3d 1052 (Trustee who waived financing contingency in contract of first buyer of property was authorized to do so under that contract and therefore did not wrongfully cause failure of condition of contract with second prospective buyer for the property, whose contract was contingent upon the termination of the first); *Podolsky & Associates, Ltd. v. City Products Corp.* (1981), 103 Ill. App. 3d 824 (Court rejected brokers' argument that they were wrongfully prevented from collecting commissions that would have been due if sublessee had exercised option to renew sublease; instead of renewing sublease, sublessee obtained the prime lease by direct assignment).

■ We agree with the trial court's rejection of McDonald's attempt to legitimize its prevention of the condition. One of the cases the court relied on was *Foreman v. Tauber*. The contract in issue was an antenuptial agreement that provided for Mrs. Tauber to receive $20,000, conditioned on her outliving her husband. He shot and killed her and then himself, effectively removing the condition of the antenuptial agreement. In the battle of estates that followed, his executor argued that Mrs. Tauber had not survived Mr. Tauber and accordingly the condition of the antenuptial agreement failed. The court was able to discern that it was Mr. Tauber's conduct that had prevented his wife's ability to fulfil the condition of outliving him, however, and held that his estate was liable to hers in the amount of $20,000. The court further noted that any uncertainties that she would have outlived him but for his conduct would be resolved against him. The court thus refused to speculate regarding what might have happened if the breaching party did not violate the contract.

In the pending case the trial court found that McDonald's had "shot down the equivalent of Mrs. Tauber." We agree. Like the court in *Tauber*, we note that "[w]hatever uncertainty there was" that the condition of the contract might not have occurred, it "was removed

by the deliberate and wrongful act" of the breaching party. 348 Ill. at 287, 180 N.E. at 830.

E. "CAUSATION" OF INJURY—BURDEN OF PROOF

McDonald's contends, however, that its actions did not cause the failure of the condition of the June 20 agreement. The condition of the contract was bankruptcy court approval, which McDonald's asserts would not have been forthcoming in any event. Therefore, McDonald's argues that its breach of contractual duty to recommend the settlement is excused.

In support of this contention, McDonald's cites the court's refusal to approve any settlement that did not contain a provision under which McDonald's would be obligated to pay interest on the settlement pending any appeals from the bankruptcy court's order. The court termed this a "structural problem" and made it clear that it would not be in the best interest of the estate if the court approved a settlement that did not ensure that the value of the settlement would not be diminished over time. Accordingly, the trustee and McDonald's amended the amended settlement agreement to include an interest rate of 8%.[3]

McDonald's maintains that because the court would not have approved the June 20 settlement agreement without such a provision for interest, McDonald's should be excused from its contractual obligation to recommend the agreement and cooperate in the entry of the necessary orders. We cannot agree, for reasons that appear obvious. Nonetheless, McDonald's labors at length in its brief to construct a "no-causation" defense to release it from the onus of the wrongful prevention doctrine. This inherently speculative argument focuses on the attempt to show that if the bankruptcy court's approval would not have been forthcoming in any event, *for reasons unrelated to McDonald's wrongful conduct*, the prevention doctrine does not apply.

McDonald's relies on selected comments to section 245 of the Restatement (Second) of Contracts (1981) to bolster its argument. That section, which reflects the general principle we have referred to as the "wrongful prevention doctrine," provides as follows:

---

[3]The record indicates that the bankruptcy court routinely required inclusion of an interest component in settlement awards, to preserve the value of the sum pending any bankruptcy appeals or other delays. McDonald's readily agreed to include the interest component in the amended settlement and there is no indication of record that it would have objected to the same interest in the original settlement agreement.

"Where a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." Restatement (Second) of Contracts §245 (1981).

In simpler English, this means that the bankruptcy court's approval of the June 20 agreement is excused as a condition of the agreement if McDonald's materially contributed to the court's lack of approval. We have concluded in the preceding sections of this opinion that McDonald's did, by its breach, prevent the court's approval of the agreement. To answer McDonald's "causation" argument, however, we must necessarily repeat some of the concepts already discussed.

Illinois courts have cited the Restatement provision with approval (see *Blackhawk*, 85 Ill. 2d 59, 421 N.E.2d 166; *Grill v. Adams*, 123 Ill. App. 3d 913, 463 N.E.2d 896). In *Hansen v. Johnston* (1969), 111 Ill. App. 2d 88, 93, 293 N.E.2d 133, 137, the court noted that "when performance of an agreement is rendered impossible by the willful acts of one of the contracting parties, the agreement to pay becomes absolute." This formulation of the wrongful prevention doctrine has been stated as a corollary to the general principle that all contracts contain an implied covenant of good faith and fair dealing. (*E.g., Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 286, 154 N.E.2d 683, 690; *Jordan v. Busch* (1936), 285 Ill. App. 217, 1 N.E.2d 745 (when cooperation of contracting party is necessary for condition to occur, party who does something to prevent the happening of the event causes the contract to become absolute and performable as though event had occurred).

McDonald's does not dispute the law as such but contends that Judge Grieman misapplied the Restatement because, as comment *b* to section 245 states, "if it can be shown that the condition would not have occurred regardless of the lack of cooperation" the failure of the condition is not attributed to the breaching party as a material cause of the failure of the condition (Restatement (Second) of Contracts §245, Comment *b*, at 259 (1981)). McDonald's relies on this caveat found in the Restatement yet rejects the Restatement's further stipulation that the "burden of showing [that the condition would not have occurred regardless of lack of cooperation] is properly thrown on the party in breach." (Restatement (Second) of Contracts §245, Comment *b*, at 259 (1981).) Comment *b* to section 245 also says that *it is not necessary for the nonbreaching party to show that the condition would have occurred but for the lack of co-*

*operation.* McDonald's, however, prefers to ignore this commentary and put the burden on the Cummingses to prove that the court would have approved the settlement agreement if Lane had refrained from presenting the new deal to the bankruptcy court judge. To support this shifting of the burden, McDonald's holds forth at some length about rebuttable presumptions and the "bursting bubble" theory that presumptions disappear once evidence contrary to the presumed fact is presented. However interesting such a discussion may be, in the context of this case it adds nothing but confusion to the analysis. The Cummingses, as the nonbreaching parties, are not required to adduce evidence of what *might* have happened if McDonald's had *not* breached.

■■ Despite the array of theories presented we easily conclude that Lane's appearance before the bankruptcy court to offer different settlement terms constitutes material contribution to the failure of the condition, as a matter of law. We need not look beyond what happened on July 10, 1985. The bankruptcy court had not withheld its approval from the agreement at that time. McDonald's did not come in to support and recommend the agreement, however. Instead the June 20 agreement was withdrawn by McDonald's and replaced with a different one. The question whether this materially contributed to the failure of the condition does not require extended discussion of bursting bubble presumptions or other matters of proof.

McDonald's cites to *Huegal v. Sassaman* (1979), 75 Ill. App. 3d 414, 393 N.E.2d 1361, a case involving contract formation rather than performance. In *Huegal,* the plaintiffs offered to buy an industrial tool distributorship from the defendants. The proposed agreement was expressly conditioned upon the plaintiff's ability to obtain a loan from a particular bank to cover the purchase price. The bank in question would not grant the loan, however, unless it was given collateral in the form of assignable contracts between the distributorship and the customers of the distributorship. Because the business was conducted with purchase orders and receipts, there were no such contracts to assign. The plaintiffs instructed the bank to deny the loan and asked defendants to return their down payment. Defendants refused on the ground that plaintiffs had instructed the bank to reject the loan application. The court ruled in plaintiff's favor, however, holding that the bank's approval of the loan depended on a requirement that was beyond the control of the parties and, without financing, the parties did not intend for the contract to

come into existence. Hence, there could be no breach. *Heugel* does not help McDonald's.

## F. PUBLIC POLICY ARGUMENTS

■ A recurring theme throughout McDonald's brief is that it cannot be held liable for breach of contract because it was acting on a higher moral plane and disclosing matters to the court that were mandated by professional duties and public policy. We have already rejected those arguments as unfounded under the circumstances of this case and see no reason to repeat them here. McDonald's also maintains, however, that the June 20 agreement itself should be declared "void" as against public policy. This is the ethical disclosure argument reformulated in broader terms. According to McDonald's, the agreement violates public policy "in two significant respects. First it embodies the Cumingses' [sic] diversion of $4 million of the $15.5 million settlement offer to Central in violation of their fiduciary duties as directors and officers of Central; second, the lower court's ruling that the settlement prohibited Lane from disclosing information to the bankruptcy court renders the June 20 settlement unenforceable."

We refuse to give any credence to such sophistry. The breach of fiduciary duty argument is disingenuous, as it suggests that the Cumingses were diverting corporate funds or trying to cheat Central in their request for compensation on their own, distinct injuries. What Thomas Cummings did on behalf of Central was play an instrumental role in obtaining the $52 million verdict in the first place. What McDonald's allegedly did to him and his family in response to that verdict is the subject of this lawsuit. McDonald's violation of the settlement agreement has resulted in seven more years of litigation. We find the fiduciary duty argument in McDonald's brief to be unworthy of additional consideration. Similarly, we reject as meritless McDonald's redundant assertion that the settlement agreement, if enforced as written, prevented Lane from disclosing the settlement negotiations and by its "suppression of evidence is void against public policy."

## G. JUDICIAL PRIVILEGE

■ McDonald's repeats a variation on the same theme in an argument relying on absolute judicial privilege to insulate Lane's statements to the bankruptcy court. This is not a defamation action, however, and the logic of McDonald's position escapes us. Lane's letter to Judge Schmetterer informed the court that notwithstanding its signed settlement agreement, McDonald's stood ready to eliminate the Cum-

mingses from the settlement. Lane's self-styled role as officer of the court does not require us to agree that his actions in breach of contract were protected by judicial privilege, however. If we adopted this position, the implication would be that any party could breach a contract with impunity simply by repudiating it in open court. We find the argument irrational and unsupported by sound authority.

## II

### PROPRIETY OF ENTERING SUMMARY JUDGMENT

McDonald's major focus on appeal has been to persuade this court to enter judgment, as a matter of law, in its favor. In the alternative, McDonald's asks for a trial. In support of its request for a reversal of the summary judgment that was entered in favor of the Cummingses, McDonald's maintains that the trial court erroneously assessed Fred Lane's credibility by ruling that Lane's letter was "false." To demonstrate that Lane's letter was not "false," McDonald's cites affidavits of its officers and counsel that vouch for the veracity of Lane's representations. Finally, McDonald's argues that the "record is undisputed that Lane's statements were truthful, and he did not wrongfully prevent bankruptcy court approval. Summary judgment should have been entered in favor of McDonald's."

■ We note that for purposes of summary judgment McDonald's professed willingness to settle with Central alone is not in dispute. We, like the trial court, also accept the veracity of the statements in McDonald's affidavits. The trial court went on to hold, however, that the *legal effect* of the Lane letter was to decimate the written agreement; this decision had nothing to do with assessing witness credibility.

No facts of record contradict the obvious conclusion that the Lane letter embodied materially different settlement terms than those which were reduced to writing and signed by the parties. Having elected to sign the agreement, McDonald's was bound to recommend and support it. Regardless of motive, and regardless of what Becker may have said as to the sequence of events leading to the written document, McDonald's is the party which affirmatively undercut the June 20 agreement in the bankruptcy court.

As we have thoroughly discussed elsewhere in this opinion, moreover, the "truth" as to Lane's and McDonald's *motives* is immaterial to the breach of contract issues. Their *acts*—wholly inconsistent with the written agreement—constituted the actionable breach. Facts that are immaterial or otherwise incompetent must be excluded from trial.

We believe that the trial court properly entered summary judgment because the ultimate issue (McDonald's wrongful prevention of the contract's condition) was a *legal conclusion* based on the *material,* undisputed facts. See, *e.g., Sloan v. Jasper County Community Unit School District No. 1* (1983), 167 Ill. App. 3d 867, 870, 522 N.E.2d 334 (purpose of summary judgment is not to try an issue of fact but to determine whether one exists).

McDonald's never explains what issues would be tried if we were to reverse summary judgment in this case. Lane's credibility is not in issue and McDonald's motives are immaterial. It is indisputed that McDonald's said it was willing to sever the Cummingses' claims from those of Central, both before and after it signed the June 20 agreement. Our ruling is based on the legal consequences of the parties' conduct.

What might have happened without the Lane letter is unknown and cannot be proved in a trial. If Lane had strongly recommended the June 20 agreement instead of ignoring it, the court *might* have ultimately approved it. Or, the bankruptcy court *might* have severed the Cummingses' claims from those of the bankruptcy estate on its own motion. The court *might* even have asked McDonald's if it was willing to tender the same money to the estate alone. What might have happened does not raise a genuine issue of material fact, however.

We are not implying that there may never be a triable issue on the question of why a party fails to perform; a party might plead valid defenses that would excuse performance for legitimate reasons. In this case, McDonald's has advanced a parade of defenses, which we have searched for merit. The trial court sifted through the various legal theories of defense and the entire record before concluding that the proffered justifications for breach were unavailing, as a matter of law. The undisputed material facts of record establish that after the June 20 settlement agreement was formally offered to the bankruptcy court, and before the court had the opportunity to fully review it, McDonald's withdrew it from further consideration in favor of a different settlement.

In reviewing McDonald's papers in opposition to the Cummingses' motion for summary judgment, we apply summary judgment principles that require us to strictly construe them against the Cummingses and in favor of McDonald's. (*E.g., Stringer v. Zachesis* (1982), 105 Ill. App. 3d 521, 522, 434 N.E.2d 50, 52.) We affirm the trial court.

As a final point, we note that the parties were experienced in business and had the benefit of impressive legal representation. Mc-

Donald's was not coerced into executing the June 20 agreement. McDonald's spin on what it did must not be permitted to tilt the analysis toward visualizing triable fact issues where none exist. Sheer repetition of arguments does not enhance them. Invoking ethical concerns to justify a breach of promise does not persuade.

### III

#### WAIVER AND RESCISSION

McDonald's next argues that it cannot be charged with violating its contractual duty to recommend approval of the June 20 settlement agreement because Central and the Cummingses were also bound by that duty and they breached it first. Alternatively, McDonald's contends that the June 20 agreement was effectively rescinded once the Cummingses' attorney consented to the court's entry of the final, amended settlement agreement.

Neither point is well-taken. Both rely on the concept of a waiver or release of McDonald's duty to perform contractual obligations. Certainly the Cummingses never breached the June 20 agreement, personally or through their attorneys. Morover, Central's trustee was the party who filed the application for court approval of the settlement. Becker and Spence were the attorneys who were advocating the June 20 agreement on behalf of Central *and* the Cummingses. If there was a conflict of interest between the Central bankruptcy estate and the Cummingses' personal claims, it was a conflict based on the allocation of a pie that was limited in size by the willingness of McDonald's to pay no more than $15.5 million on the $52 million verdict.

We find it necessary to digress once more into the bankruptcy court proceedings because McDonald's in this argument asserts that it was *Becker* who first violated the covenant of seeking bankruptcy court approval. In support of this contention, McDonald's states that Becker "adamantly refused" to recommend approval of the settlement because when the court asked Becker whether he thought the settlement of $15.5 million was a good one, Becker "refused to give a responsive answer."

Becker's responses to the court's questions were given against the backdrop of the extremely protracted State court litigation and the "no-settlement" posture McDonald's had taken from the beginning of the Central litigation. McDonald's puts much weight on representations Becker made to the bankruptcy court on July 9, 1985, when asked whether the settlement arrangement was, in his opinion as spe-

cial litigation counsel to the trustee, the best negotiated settlement that could be expected under the circumstances. Becker was in a unique position to answer because of his involvement in the Central trial in the State court. His personal opinion as to the "value" of the settlement, however, was not necessarily what the court was seeking. The transcript of the colloquy between Becker and Judge Schmetterer on this point shows that Becker, by his own admission, was unable to give the court "a one-word answer." Our review of the pertinent transcript illuminates why. Becker cited the scope of the 13-week jury trial and massive evidence; the enormous resources required to sustain such litigation; and the need for the Cummingses to come up with litigation financing in the form of soliciting loans on behalf of the bankrupt company. What this meant to Becker was that if the jury verdict were reversed by Judge Norman for a new trial, in all likelihood there would be no second trial, plaintiffs lacked the money. Becker reiterated that he believed "very strongly" in the merits of Central's case and in the amount of the jury's verdict, which he said was low under the evidence. On the other hand, Becker stated that the ability of the bankrupt estate to "withstand even a minor setback" at that point was low. After additional discussion of whether or not it was appropriate for Becker to venture a valuation of the case as litigation counsel, the court asked Becker if he had "any other opinion" to give about the settlement and he replied he "believed not" because, although he would be happy to expound, it was "very difficult." The court then adjourned for the day, after making a few general comments about its role as "inquisitor" and expressing admiration for the lawyering up to the verdict. The court did express some concern over a possible conflict of interest on the part of the lawyers with respect to the June 20 agreement.

The next day, of course, further consideration of the settlement agreement was mooted by the production of the Lane letter and the "amended" settlement agreement. As we have concluded, that was what prevented the condition of the agreement from occurring. Therefore, McDonald's position that Becker was first to violate the agreement is unpersuasive.

Similarly meritless is the assertion that the Cummingses consented to a rescission of the June 20 agreement through their new counsel, Arnold Pagniucci. When Pagniucci appeared on their behalf, the bankruptcy court already had accepted McDonald's offer to tender the full $15.5 million to the bankruptcy estate; the parties' written agreement of June 20 was simply discarded. Pagniucci sought and received assurances that nothing in the bankruptcy court orders or pro-

ceedings was to be construed as a waiver of the Cummingses' separate right to proceed against McDonald's for any claims then in existence.

McDonald's apparently assumes that because the "amended" settlement agreement superseded the original written agreement of the parties, no legal rights or duties arising out of the June 20 agreement survived. This ignores the key point that at no time did the Cummingses receive any bargained-for exchange under the new agreement because they were, in effect, unilaterally cut out of the proceedings. The settlement of the Central Ice Cream litigation was perceived by all to be of major importance, moreover, and the Cummingses were not trying to impede that settlement; however, they were not willing to sign a release of their post-verdict claims without being compensated for them. The fact that the amended agreement settled the Central litigation is certainly no grounds for a ruling that the Cummingses agreed to a rescission of the agreement they had signed in settlement of their own claims. Indeed, McDonald's even admits in its brief that the Cummingses "persisted in their objection to the $15.5 million settlement" in its amended form. The record reflects Thomas Cummings' statement to Judge Schmetterer confirming that he was not waiving his personal claims and therefore he objected to the approval of the amended agreement. We conclude that the Cummingses, through their attorneys, never asked the court to reject the agreement they signed in good faith, nor did they agree to its rescission.

## IV

### DAMAGES, ATTORNEY FEES, AND RATE OF INTEREST

#### A. McDONALD'S APPEAL FROM DAMAGES AND INTEREST AWARD

McDonald's challenges both the damages award of $4 million in principal and the interest of $1,169,864. The Cummingses cross-appeal from the interest award and the denial of their request for an award of attorney fees premised on the bad-faith conduct of McDonald's.

The $4 million award is the aggregate amount specified in the June 20 agreement to settle the Cummingses' claims. It includes the agreed-upon allotment of attorney fees payable to Spence and Becker ($1.6 million, or 40% of the total). The interest award is based on the statutory rate for prejudgment interest (5%), calculated for the period of July 11, 1985, to the day summary judgment was entered on behalf of the Cummingses in the pending case.

In its appeal, McDonald's contends that (1) the Cummingses are entitled to no more than nominal damages because they established no actual damages; (2) the trial court put the Cummingses in a better position than they would have been absent the breach; (3) under the agreement itself the Cummingses' award would have been limited to $2.4 million; (4) the trial court failed to set off the Cummingses' claim by the amount of benefits they have received "by virtue of the alleged breach"; and (5) the trial court erred in its determination that the prejudgment interest began to accrue on July 11, 1985, which was the day after Lane submitted the letter to the court.

None of these arguments have merit. The Cummingses' damages plainly were not amorphous, uncertain, or otherwise unproveable; the proof is in the settlement agreement. The sum specified therein was the agreed-upon amount and no additional evidence on what was in effect stipulated damages is necessary or desirable. Although McDonald's cites a number of cases regarding the elements of contract damages, the relief granted here was in the nature of specific performance of the settlement agreement. There simply is no question as to what amount is set out in the agreement to compensate the Cummingses on their personal claims. Consequently, we summarily reject McDonald's conclusion that the Cummingses did not prove actual damages.

The second point, that the bankruptcy court put the Cummingses in a better position than they would have been absent the breach, is mystifying. Apart from being obliged to spend many additional years in litigation by pursuing the instant suit, the Cummingses did not receive any compensation for their personal claims whatsoever. McDonald's suggests that because it increased the settlement to the Central estate by $4 million, the Cummingses benefited by receiving a greater share of the settlement money through Central than they would have under the June 20 settlement agreement. McDonald's does not show what net amounts the Cummingses ultimately received as shareholders or creditors of Central after the other debts were paid, however. More significantly, McDonald's does not explain how that disbursement of the bankruptcy monies bears any relation to the Cummingses' separately bargained-for damages arising out of their tort claims against McDonald's. Any "windfall" to the Cummingses resulting from the increase in the amount paid to the Central estate was most likely "offset" by the expenses and inconvenience of seven more years of litigation that the Cummingses have now endured in pursuing their claims.

■■ McDonald's attempt to limit the award of damages to the $2.4 million figure allocated in the settlement agreement is also baseless. The agreement refers to the aggregate amount of $4 million in compensation for the Cummingses' claims; the breakdown of that sum into a percentage for the attorneys simply represents the contingent fee amount that Spence and Becker were claiming for their representation of the Cummingses on the personal claims. By enforcing the June 20 agreement, the trial court did nothing to change the Cummingses' responsibility for paying their lawyers 40% of the recovery. The only thing that has changed is the amount of work their attorneys have had to put in since the date of the settlement agreement in order to enforce it.

■■ The fourth reason, that the Cummingses' award is subject to a setoff, is basically the same as the second reason discussed above. We have found no merit in the argument that the Cummingses' personal damages should be reduced because of the "windfall" effect that supposedly occurred once McDonald's tendered the portion allocated to the Cummingses directly to the Central bankruptcy estate.

■■ The final point McDonald's offers as a means of reducing the damages award relates to the accrual of prejudgment interest on the principal amount of damages. According to McDonald's, the trial court erred in setting July 11, 1985, as the day interest began to accrue. McDonald's quotes the prejudgment interest statute as providing for interest to be paid on "moneys after they become due" (Ill. Rev. Stat. 1989, ch. 17, par. 6402). In this case, according to the June 20 settlement agreement, the principal due thereunder was to be paid on "the business day following the date that entry of an order approving this Settlement Agreement by the Bankruptcy Court becomes final" (emphasis by McDonald's). Under this rationale, presumably, no interest would ever be due because the June 20 settlement agreement never was the subject of an order of approval which became final. McDonald's does not go so far as to assert that no interest should be assessed, however. Instead, McDonald's argues that we should adopt the date that McDonald's made payment under the amended settlement agreement, May 11, 1987, which was the date the bankruptcy court's order became final after the exhaustion of the bankruptcy court appeals.

While it is true that had the June 20 agreement been approved in the ordinary course of proceedings, payment of the settlement amount would not be due until some period of time later than July 11, 1985. The trial court's adoption of July 11, however, was appropriate as being the day after the breach. Once McDonald's breached the

agreement, its obligation to pay (and the accrual of interest) can fairly be said to vest at that time. (*E.g., Art Press, Ltd. v. Western Printing Machinery Co.* (7th Cir. 1988), 852 F.2d 276 (construing Illinois law); see also *E.M. Melahn Construction Co. v. Village of Carpentersville* (1981), 100 Ill. App. 3d 544, 427 N.E.2d 181 (prejudgment interest is computed from the date the money becomes due).) The June 20 agreement provided for payment the next business day after the order approving the agreement became final. Since McDonald's prevented such approval, the court rightly found that the date of the breach (or, in this case, the next business day after) started the accrual of interest. We find no error in the trial court's decision to compute interest from July 11, 1985, to the date of its final judgment in this case.

### B. CROSS-APPEAL FROM RATE OF INTEREST AND DENIAL OF FEES

In the Cummingses' cross-appeal from the *amount* of the prejudgment interest assessed, they urge this court to adopt the higher, prime rate of interest instead of the relatively low statutory rate. They cite cases in support of their position that because the statutory rate does not fully compensate them, they should be awarded an increased amount of interest. See *In re Estate of Wernick* (1989), 127 Ill. 2d 61, 86-87, 535 N.E.2d 876, 888 (prejudgment interest may be awarded on equitable grounds at the prime rate rather than the statutory limit when necessary to provide just compensation for money wrongfully withheld and to make injured party whole) (involving breach of fiduciary duties).

Our review of the trial court's award of the statutory rate of prejudgment interest is limited to whether the court abused its discretion in declining to substitute a higher rate. While equitable concerns may justify the prime rate, as was the case in *Wernick*, we are not prepared to conclude that the trial court abused its discretion in applying the rate provided by statute. The Cummingses' plea for the higher rate has some merit in light of the fact that McDonald's has had use of the settlement proceeds since the breach and the Cummingses have not had the opportunity to invest it at more favorable rates. *Wernick* does open the way for courts to apply the prime rate as a means of better compensating injured parties; however, in the pending case the trial court concluded that the statutory rate was appropriate. Unlike the situation in *Wernick*, McDonald's is not in a fiduciary relationship with the Cummingses and the award of prejudgment interest was not based on the "vexatious delay" provision of the interest statute; instead, it was based on the provision that permits

interest to accrue on written instruments after the money is due. (Ill. Rev. Stat. 1989, ch. 17, par. 6402.) While the *Wernick* decision suggests that the statutory rate is not to be considered as a limit in all cases, the trial court determined that the interest portion of damages was otherwise adequate in this case. By finding that interest began accruing on the day after the breach, moreover, the court permitted the Cummingses a larger interest award than they would have received if the court had adopted McDonald's contention that accrual should not be deemed to begin until May 1987, almost two years later. Accordingly, we affirm the award of interest, both as to rate and date of accrual.

ATTORNEY FEES

The Cummingses' second issue in their cross-appeal requests an award of attorney fees based on a so-called "bad-faith" exception to the requirement in Illinois that attorney fees may not be assessed absent a specific statute or agreement. In the pending case, no provision in the settlement agreement mentioned attorney fees and there is no statute that the Cummingses cite as justification for such an award. Even if we were to agree that McDonald's position throughout the litigation has been oppressive and vexatious, Illinois law has not applied a common law, bad-faith ground for awarding attorney fees. In fact, the Cummingses concede that while Illinois courts "seem to indicate a willingness to consider applying the bad faith exception," none have done so to this date. See, *e.g., Bank of Waukegan v. Epilepsy Foundation of America* (1987), 163 Ill. App. 3d 901, 516 N.E.2d 1337.

We agree with the trial court that the "inherent" power of the court to punish improper conduct of parties and attorneys is currently limited to contempt citations. The power to assess attorney fees absent an agreement, moreover, has traditionally been limited to specific statutes that provide for such awards or the supreme court rules, which permit fee sanctions for filing false or inadequately investigated pleadings (Rule 137) or for discovery violations (Rule 219). We decline to extend existing law by adopting a "bad faith" exception to the American rule.

We conclude that the trial court's judgment in appeal No. 1—91—2131 should be affirmed in all respects, as to McDonald's liability; the amount of damages; the amount of prejudgment interest; and the refusal to award the Cummingses attorney fees based on McDonald's bad faith.

DISMISSAL OF NON-McDONALD'S DEFENDANTS AS "AGENTS"

The second appeal in this consolidated matter centers on the status of the remaining, non-McDonald's defendants. These defendants are the individuals and detective agencies which, allegedly acting at McDonald's request, implemented the harassing tactics that are the subject of the pending action.

■■■ The sole issue is whether these defendants were "agents" of McDonald's for purposes of the release of claims that the Cummingses signed in exchange for the $4 million payment from McDonald's under the June 20 settlement agreement.

After holding a hearing on the status of these defendants the trial court concluded that it was clear from the record that the intention of the parties had been to release all defendants when they signed the June 20 releases as part of the settlement agreement. While the Cummingses contend on appeal that these individuals and agencies acted as independent contractors and co-conspirators who are still answerable for their tortious conduct, the trial court found that all had been operating solely at the behest of McDonald's. Accordingly, on June 27, 1991, the court granted their joint motion to dismiss pursuant to section 2—619 of the Illinois Code of Civil Procedure. (Ill. Rev. Stat. 1991, ch. 110, par. 2—619.) As a matter of law, the court found that the following definition in the Cummingses' release covered those defendants as well as McDonald's:

> "a. 'McDonald's' shall mean McDonald's Corporation; the past and present subsidiaries and affilliates of McDonald's Corporation; the past and present officers, directors, employees, *agents* and attorneys of any of the above, and the successors, assigns, heirs and personal representatives of any of the above." (Emphasis added.)

Another portion of the settlement agreement stated that McDonald's and the Cummingses "wish to settle all potential litigation between them and put all aspects of this matter to rest so far as all are concerned." Counsel for the Cummingses admitted that the litigation against the non-McDonald's defendants was wholly caused by the fact McDonald's had breached the settlement agreement. The only sound conclusion from the June 20 agreement and release language, statements of counsel, and the record as a whole is that when the settlement agreement was executed, in 1985, the release was intended to end all further litigation directly relating to the Cummingses' personal

claims against McDonald's. Because it was McDonald's who activated the non-McDonald's defendants, they must be viewed as McDonald's agents who carried out the plan.

The Cummingses maintain on appeal, however, that because the non-McDonald's defendants were not *specifically* named or designated in the release, their liability was not extinguished. For support, they rely primarily on *Alsup v. Firestone Tire & Rubber Co.* (1984), 101 Ill. 2d 196, 461 N.E.2d 361. In that case, Firestone, a tire manufacturer, appealed from the denial of its motion for summary judgment, which was premised on the fact that before suing Firestone, the Alsups settled and released their personal injury claims against the driver of the automobile which had struck the Alsups' car. The release they signed included "all other persons, firms, and corporations, both known and unknown."

In reversing, the supreme court held that the Contribution Among Joint Tortfeasors Act (Contribution Act or Act) (Ill. Rev. Stat. 1983, ch. 70, par. 302(c)) intended to abrogate the common law rule that the release of one tortfeasor released all, and, to that end, held that a release must "specifically identify [the other] tortfeasors in order to discharge their liability." (*Alsup*, 101 Ill. 2d at 200, 461 at 363.) The court concluded that a release under the Act was not meant to discharge other tortfeasors unless they were "designated by name or *otherwise specifically identified.*" (Emphasis added.) 101 Ill. 2d at 203, 461 N.E.2d at 364-65.

Other cases involving the Contribution Act have followed *Alsup* and rejected the contention that a particular tortfeasor may be released from liability without being identified clearly in the release. *E.g., Brady v. Prairie Material Sales, Inc.* (1989), 190 Ill. App. 3d 571, 546 N.E.2d 802 (Defendant who was not a party to the release contract nor designated by name or otherwise specifically identified was not discharged from liablity); *Stro-World Farms v. Finnell* (1991), 211 Ill. App. 3d 113, 569 N.E.2d 1156 (Release included "heirs, agents, servants, successors *** and all other persons, corporations, firms, associations or partnerships"; however, court held that plaintiffs who attempted to come within "agent" designation were not released under the *Alsup* rationale); *cf. Christmas v. Hughes* (1989), 187 Ill. App. 3d 453 (unnamed employee of a settling party properly released under covenant not to sue cab company or "any of its agents, servants, or employees").

In our view, a particular release must be considered in the context of the litigation in which it was given. The intent of the parties at the time the release was entered is controlling. (*Kolar v. Ray*

(1986), 142 Ill. App. 3d 912, 492 N.E.2d 899; see also *Rakowski v. Lucente* (1984), 104 Ill. 2d 317, 472 N.E.2d 791.) We acknowledge that *Kolar* and *Lucente* were decided without reliance on *Alsup*. We also acknowledge that the fourth district in *Stro-World* apparently read *Alsup* as requiring a " 'bright-line' rule" regarding the necessity of explicitly naming released tortfeasors. (*Stro-World*, 211 Ill. App. 3d at 118, 569 N.E.2d at 1159.) We are not faced with an issue of statutory contribution, however, and we do not read *Alsup* as requiring that all tortfeasors be identified by *name* before a release is effective. Indeed, *Alsup* permits identification by means other than actual naming (such as designation by class of persons). The supreme court in *Alsup*, moreover, was explaining how the Contribution Act modified the harsh common law principle that the release of one joint tortfeasor operates as an automatic release of all, regardless of whether a party actually intended to release other parties. In the pending case, the trial court found that there was not "even a whisper of a fact" issue on the parties' unambiguous intent to "settle everything" in 1985; back then, the Cummingses viewed the other defendants, known or yet to be discovered, as agents who had acted pursuant to McDonald's directives.

The facts of *Alsup* are also distinguishable from those of the pending case. There the party seeking the benefit of the release was Firestone, as manufacturer of the tires. Whatever duty or liability Firestone may have had to the plaintiff was different in kind from that of the settling defendant's negligence in driving. In the pending case, however, the tortious actions of the non-McDonald's defendants derived totally from McDonald's directive and goals. The other defendants were the means by which McDonald's carried out its campaign against the Cummingses.

It may be true that the original agencies that McDonald's had engaged then hired their own subcontractors without directly informing McDonald's. There is no doubt, however, that McDonald's is the party who initiated the investigation of the Cummingses for its own questionable purposes. We believe that the trial court correctly interpreted the parties' intent in 1985 that the release would reach all of the non-McDonald's defendants also, as "agents" of McDonald's.

Apparently, the passage of time and the frustrations of many additional years of litigation has led to the Cummingses' attempt to hold the non-McDonald's defendants separately accountable for their actions. While we are not implying that these investigative agencies automatically should be immunized from any illegal conduct they may have engaged in, we do agree with the trial court that the unambigu-

ous intention of the parties back in 1985 is what controls in *this* case. Accordingly, we find that the trial court's entry of specific performance of the June 20 settlement agreement and its attendant releases was proper.

We conclude that the trial court did not misapply *Alsup* to the facts of the pending case. While the non-McDonald's defendants were not parties to the 1985 settlement agreement and release, their general existence and role in McDonald's alleged campaign was known and, we believe, specifically intended to be included in the release under the "agent" rubric. They were not acting independently and no one thought they were until the pending litigation made it advantageous for the parties to take differing legal positions in support of or opposing their status as agents of McDonald's.

McDonald's, the other defendants, and the Cummingses have all taken mutually contradictory positions on the issue of agency. At one time, McDonald's litigation stance necessarily sought to disavow the acts of the non-McDonald's defendants; by denying its control over those defendants and distancing itself from the illegal conduct, McDonald's could deny liability for their allegedly wrongful acts. The Cummingses, of course, viewed McDonald's as the orchestrator of the tortious activity and in that sense at least, the acts of the non-McDonald's defendants would be imputed to McDonald's through agency principles. Now however, the Cummingses find it strategically beneficial to urge us to hold that the other defendants were not agents after all, but rather co-conspirators or independent contractors. We see no justification, however, for engaging in what amounts to theoretical discussion of issues that are not pertinent under the actual facts of this case. We reject the notion that the parties' changing theories on the issue of agency create a genuine issue of material fact. As we did in response to McDonald's multiple-pronged attack against the summary judgment entered against it, we conclude that the Cummingses' challenge to the trial court's conclusions on the scope of the 1985 release is unpersuasive. Accordingly, we affirm the trial court's order dismissing the non-McDonald's defendants from the case.

We affirm, in their entirety, the trial court's judgments that are the subject of these combined appeals.

Affirmed.

JOHNSON, J., concurs.

PRESIDING JUSTICE JIGANTI, dissenting:

With apologies to the persevering reader who has endured moats, mountains and a hurricane, I must respectfully dissent from the majority opinion. I promise to be brief. This is an appeal from the allowance of a motion for summary judgment in favor of the plaintiffs, Thomas and Barbara Cummings, in the breach of contract action against McDonald's. The majority opinion appears to be that of a trial court deciding a question of fact. Summary judgment is a question of law. *Demos v. National Bank of Greece* (1991), 209 Ill. App. 3d 655, 659-60, 567 N.E.2d 1083.

The instant breach of contract action emanated from an underlying lawsuit by Central Ice Cream Company, an Illinois corporation, and against McDonald's Corporation. A verdict was entered in favor of Central and against McDonald's in the amount of $52 million. While Thomas and Barbara Cummings were officers and directors of Central and owned substantial stock, they were not parties themselves to the lawsuit. Not being parties, they were, of course, not entitled to a portion of the judgment.

Central, McDonald's and the Cummingses signed a settlement agreement, also referred to in these proceedings as the contract. That agreement accomplished two things. First, by allocating $11.5 million to Central and $1.6 million to the attorneys, it settled the action between Central and McDonald's. Second, the settlement agreement allocated $2.4 million to the Cummingses, not for any personal claim emanating from the litigation between Central and McDonald's, but rather "to settle all potential litigation between them." The settlement agreement was conditioned upon the approval of the bankruptcy court. The agreement provides that McDonald's "will recommend approval of the Settlement Agreement without reservation." It is this provision of the contract that the Cummingses claim, and the trial court found, was breached. The contract also provides that the trustee will petition the court for approval of the agreement "setting forth the complete terms hereof and seeking entry of an order acknowledging all such terms and the reasonableness thereof and finding that such terms are fair, equitable and to the benefit of the Bankrupt Estate."

The Cummingses contend that the contract was breached by the conduct of Fred Lane, a McDonald's attorney, during the course of the hearings in the bankruptcy court by introducing evidence of the negotiations to reach the settlement. The significance of the negotiations is that they indicate to whom McDonald's made an offer of set-

tlement. The trial court found as a matter of law that the contract provision stating that McDonald's was to recommend approval of the settlement without reservation was breached by the introduction of this evidence.

The pertinent facts in the record relating to the settlement agreement are that McDonald's initiated settlement discussions with trial counsel for Central, Gerry Spence. Spence stated that McDonald's initially offered $11 million, which was rejected, and after additional negotiations the amount of $15.5 million was verbally agreed upon. At that time there was nothing mentioned about the Cummingses. Thomas Cummings was initially elated about the settlement, but later after conferring with his attorney, and then with a bankruptcy attorney, he was informed that after the creditors' claim was satisfied he was "not going to see a penny" of the settlement. Cummings said that he would not sign the agreement either on behalf of Central or personally. According to Spence, Cummings stated that "[y]ou're asking me to give up—the possibility of giving up $15 million and a half and getting nothing. And then also giving up my own personal claims?" Spence had a "big fight" with Cummings over the matter because he had given "his word" to McDonald's. Cummings asked if McDonald's would agree to $5 million to be set out of the total settlement for his claims. Spence spoke to Donald P. Horwitz, a lawyer and an executive vice-president of McDonald's, who had "an absolute uncontrolled fit" and rejected the notion of paying Cummings anything. McDonald's threatened to take the matter directly to the bankruptcy court without the Cummingses' participation or release. Spence testified that he told the McDonald's representative:

> "Well, please, what difference does it make to you how this money is spent? We have got to take it to the bankruptcy judge. We will make a full disclosure to the bankruptcy court. How it [$15.5 million] is spent shouldn't be any of McDonald's business. What difference does it make to you? I made a deal for fifteen and a half million dollars. Now, you want to tell me how to spend it."

Horwitz, in an affidavit on the motion for summary judgment related that he told Spence:

> "McDonald's was willing to pay a total of $15.5 million to Central in full satisfaction of the judgment in the Central Ice Cream litigation and it was up to the bankruptcy court to direct to whom the fund should be paid. I [Horwitz] said that as long as McDonald's is not required to pay any more than $15.5 million in full settlement of Central's judgment and it receives

appropriate releases from Central, McDonald's would agree to an allocation to Mr. Cummings which was approved by the bankruptcy court only if the entire agreement reflecting the $11.5 million and the $4 million is presented to the bankruptcy court and the court is fully advised of all the settlement negotiations giving rise to the agreement, including that McDonald's had been willing to pay the entire $15.5 million to Central and is still willing to make that payment."

Shelby Yastrow, an attorney for McDonald's, by affidavit stated that he was a party to the conversation between Spence and Horwitz and essentially reiterated what Horwitz had stated.

With these facts in the background and known only to the parties, the bankruptcy judge, Jack B. Schmetterer, at the beginning of the hearing, quoting from the case of *Protective Committee for Independent Stockholders of T M T Trailer Ferry, Inc. v. Anderson* (1968), 390 U.S. 414, 20 L. Ed. 2d 1, 88 S. Ct. 1157, stated that in order to determine whether a compromise was fair and equitable it needed all facts necessary to make an intelligent and objective opinion. In order to do so, he had to take a "quasi-inquisitorial role." Even before the hearing started, one of the attorneys for the creditors suggested that he wanted to depose Theodore M. Becker, special litigation counsel for the trustee in the McDonald's lawsuit, and also an attorney for Thomas Cummings. He specifically wanted to question Becker about the negotiation process.

Becker was the first witness in the hearing before Judge Schmetterer and explained the settlement agreement; however, his explanation was at odds with settlement negotiations as related in the majority opinion and in this dissent. Becker stated that McDonald's was "absolutely adamant" and insisted upon a personal release from Cummings throughout the settlement negotiations. He stated that McDonald's was the one who allocated $11.5 million to Central and the $4 million to the Cummingses and their attorneys. The bankruptcy judge after only hearing Becker indicated that when the lawyers for the estate embarked upon settlement discussions, they were put in a conflict of interest situation with the estate.

The alleged breach of contract occurred the following day before testimony began. McDonald's attorney, Fred Lane, informed the court that the original settlement between McDonald's and Spence called for McDonald's to pay $15.5 million in settlement of the circuit court litigation; the only litigation pending at that time was between Central and McDonald's. Lane related that McDonald's informed plaintiffs' counsel that the Cummingses' execution of release was not a

condition of the settlement and that the fund could be allocated on any basis that the plaintiffs wanted as long as the bankruptcy court approved, and as long as it does not cost McDonald's any more money, and that they received a release from the trustee on behalf of Central.

Patently, the parties had a duty to disclose settlement negotiations. The bankruptcy court was keenly aware of the fact that it had to determine the fairness of the settlement and needed all necessary facts to make that determination. It was presented a settlement agreement that settled a matter not only with the subject matter of the bankruptcy, Central, but also the agreement with the president of Central who at that time had no litigation pending. At the very hearing when only Central's attorney, Becker, testified, the bankruptcy court determined that there was a conflict of interest between Becker and the bankrupt estate. The testimony of Becker at the hearing was contrary to the facts as testified to, not only by McDonald's but also Spence, and are not contradicted anywhere in this motion for summary judgment. The information was relevant. Attorneys are officers of the court and must make a complete disclosure of relevant facts. (*People v. Buckley* (1987), 164 Ill. App. 3d 407, 413, 517 N.E.2d 1114.) Concisely, a contract cannot be breached by withholding relevant information from the court.

Secondly, the agreement specifically provides that the bankruptcy court would be petitioned for approval and that the complete terms would be set forth and an evaluation made of the reasonableness of those terms by the bankruptcy court. All of the evidence before the court in this motion for summary judgment amplifies that provision in the contract.

The attorneys were duty bound and contractually bound to inform the court of the negotiations and this contract was not breached by providing that information. In my estimation, the judgment of the trial court should be reversed.