**Mark K. PATTON, M.D., a single man, Plaintiff–Appellant,**

v.

**Lynn Jacob COX, wife, and as Independent Executrix of the Last Will of Michael D. Cox, Defendant–Appellee.**

No. 00–15537.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 15, 2001

Filed Jan. 7, 2002

Charles E. Buri (argued), Friedl, Richter & Buri, P.A., for the appellant.

Foster Robberson (argued), Susan M. Freeman, W. Todd Coleman, Lewis & Roca, LLP, for the appellee.

Before: WOOD, JR.,* KOZINSKI, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Dissent by Judge HARLINGTON WOOD, JR.

O'SCANNLAIN, Circuit Judge:

In this diversity action, we must decide whether a witness in a state quasi-judicial proceeding is immune from a breach of contract action arising out of his testimony.

I

Dr. Mark K. Patton practices medicine in Arizona. He and his former wife, Shellie Trembath, divorced in 1994 and are embroiled in a bitter and protracted child-custody battle, which is taking place in a Utah state court. In December of 1996, Trembath asked the Utah court to order Dr. Patton to submit to a psychological evaluation by Dr. Cox, who practices psychology in Texas. The Utah court granted her request and issued the order. Dr. Cox evaluated Dr. Patton in Texas in January of 1997. Before the evaluation began, Dr. Patton asked Dr. Cox to keep the results of the evaluation confidential; the parties dispute whether Dr. Cox agreed to Dr. Patton's request. It also appears that before evaluating Dr. Patton, Dr. Cox had a therapeutic relationship with Trembath, her 166 new husband, and Trembath's sister—Dr. Patton's former sister-in-law, the latter of whom alleged that Dr. Patton had engaged in improper sexual conduct with her. As a result, the Arizona Board of Medical Examiners ("BOMEX") filed a complaint, charging him with unprofessional conduct and unfitness to practice medicine.

The complaint against Dr. Patton was heard by an Administrative Law Judge in Phoenix in May of 1998. At the BOMEX hearing, Dr. Cox voluntarily testified as an expert witness on behalf of the State of Arizona. Both his testimony and his pretrial communications with the state Attorney General revealed the results of his examination of Dr. Patton—namely, he believed that Dr. Patton was a pedophile and a danger to children. Dr. Patton subsequently sued Dr. Cox for breach of contract, promissory estoppel, and infliction of severe emotional distress.

The district court found that absolute witness immunity precludes any liability arising from the testimony and pre-trial proceedings of a quasi-judicial hearing. Accordingly, it granted Dr. Cox's motion to dismiss for failure to state a claim upon which relief can be granted. Dr. Patton timely appealed.

II

This is a diversity action under 28 U.S.C. § 1332. When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Because this suit was filed in the District Court of Arizona, we look to that state's choice of law rules. Arizona courts follow the Restatement (Second) of Conflict of Laws (hereinafter "Restatement") as a guide in choice of law questions. *Lucero v.*

* Honorable Harlington Wood, Jr., Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

*Valdez,* 180 Ariz. 313, 884 P.2d 199, 201 (App.1994). The Restatement § 6 sets forth several relevant factors in determining which law to apply, including: (1) the needs of the interstate systems, (2) the relevant policies of the forum state, (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability, and uniformity of result, and (7) ease in the determination and application of the law to be applied.

A

Because each state has a connection to the parties or the matter, Arizona, Texas, or Utah law could potentially apply. According to the Restatement, the objective is to apply the law of the state that has the "most significant relationship" with the parties and the dispute. *See* SYMEON C. SYMEONIDES, ET AL., *Conflicts of Laws: American, Comparative, International* (1998). A "significant relationship" includes not only the raw number of contacts a state has with a matter, but also the importance and depth of those contacts.

Utah's connection to this dispute is minimal. Neither petitioner nor respondent are domiciled in, or licensed to work in, Utah. Dr. Cox's evaluation of Dr. Patton and the testimony for which he seeks immunity took place elsewhere. However, the impetus behind the evaluation came from a Utah court charged with resolving a custody dispute between Dr. Patton and his former wife. The Utah court expressly ordered Dr. Patton to see Dr. Cox in order to determine his fitness to visit his children; thus, Dr. Cox evaluated Dr. Patton in contemplation of testifying in a Utah court. Further, Dr. Patton expected that any information gleaned from the evaluation would only be used in the Utah proceeding. Dr. Cox's testimony became unnecessary, however, and was never given in the Utah court.

Texas's connection to the litigation is stronger than Utah's. First, Dr. Cox is domiciled and licensed to practice psychology in Texas. Second, the evaluation took place in Houston at Dr. Cox's office. Finally, it appears that Dr. Cox's promise to Dr. Patton that he would not release the results of his evaluation in circumstances other than the Utah child custody proceeding occurred in Texas.

Arizona also has a significant relationship to the dispute. Dr. Patton is licensed to practice medicine in Arizona and has actively done so since 1996. The proceeding in which Dr. Cox gave the testimony for which he now seeks immunity took place in Arizona. Also, the impact of Dr. Cox's testimony was centered primarily in Arizona, as BOMEX placed Dr. Patton on probation for no fewer than five years, ordered him to undergo psychotherapy, and restricted his ability to treat young female patients.

B

Using the Restatement's § 6 factors to guide our analysis, we conclude that Arizona law applies to this dispute. Because Utah never used the results of the evaluation it ordered, its connection to this dispute ended before the Arizona proceedings began. We reference the Utah order only to show the intended scope of disclosure of Dr. Cox's evaluation. While both Texas and Arizona claim one party who both lives and works in its state, it is Arizona that has the strongest interest in applying its laws governing the liability of witnesses who testify in its quasi-judicial proceedings.

Considering the relevant interests of both Texas and Arizona in the determination of a witness' immunity, most persuasive is the fact that this quasi-judicial proceeding and Dr. Cox's testimony took place in Arizona. While Texas has an interest in protecting its professionals who choose to give expert testimony, Arizona's interest is far greater in ensuring the proper public policy balance in its quasi-judicial proceedings among truth-finding, protecting privacy, and respecting prior agreements.

Furthermore, because the testimony and proceeding occurred in Arizona, the reasonable expectations of the parties would be that Arizona law would apply. While the actual agreement of limited disclosure between Dr. Patton and Dr. Cox arose in Texas, this appeal is not about whether that contract was formed and breached, but rather, even if it were, whether Dr. Cox nevertheless enjoys immunity for his testimony. As such, when he chose to be a witness in an Arizona proceeding, Dr. Cox could have reasonably expected that Arizona law would apply. So, too, would someone subject to BOMEX discipline proceedings, like Dr. Patton, expect Arizona law to govern any dispute arising from it.

Finally, Arizona has a strong interest in ensuring uniformity of witness immunity in its quasi-judicial proceedings. If a witness carried with him the witness immunity laws of the state in which he were domiciled, Arizona citizens' ability to pierce a witness' claim of immunity would vary depending upon the state in which that particular witness lived. By applying Arizona law, however, the state can ensure that all participants in its quasi-judicial proceedings enjoy uniform and predictable rules with respect to witness immunity.

For these reasons, we are persuaded that Arizona has the "most significant" relationship with the dispute and we apply Arizona law.

## III

Arizona courts have extended witness immunity to quasi-judicial proceedings and pre-trial communications. *See Burns v. Davis,* 196 Ariz. 155, 993 P.2d 1119 (App.1999); *Western Techs. Inc. v. Sverdrup & Parcel, Inc.,* 154 Ariz. 1, 739 P.2d 1318, 1322 (App.1986). Dr. Patton seems to concede that witness immunity would protect Dr. Cox from a tort claim (e.g., defamation); however, he argues that the scope of immunity should not extend to breach of contract claims. Arizona courts have not apparently addressed the issue of whether witness immunity bars a claim for breach of contract against the witness. Therefore, we must predict how the Arizona Supreme Court would rule in this case.[1]

### A

Courts have articulated the policies protected by granting witnesses immunity from suits arising out of their testimony: the free-flow of information in a truth-finding process, *see Jurgensen v. Haslinger,* 295 Ill.App.3d 139, 229 Ill.Dec. 574, 692 N.E.2d 347, 350 (1998) (Absolute immunity "provides complete immunity from civil action, even though the statements are made with malice, because public policy favors the free and unhindered flow of information."), encouraging witnesses to come forward to testify, *see Briscoe v. LaHue,* 460

1. *See NLRB v. Calkins,* 187 F.3d 1080, 1089 (9th Cir.1999) (where the state's highest court has not addressed an issue, a federal court's task is to "predict how the highest court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance") (internal citations omitted).

U.S. 325, 335, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) ("[T]he importance of accurately resolving factual disputes in criminal (and civil) cases [is] such that those involved in judicial proceedings should be 'given every encouragement to make a full disclosure of all pertinent information within their knowledge.' ") (quoting *Imbler v. Pachtman,* 424 U.S. 409, 439, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (White, J., concurring in the judgment)), and curbing collateral, even vindictive, litigation, *see Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) ("Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.").

However, as Arizona courts recognize, the policies behind grants of witness immunity are subject to balancing with competing interests: "[P]ublic policy dictates that th[e] need to ensure complete and truthful testimony must be balanced against extending protection to administrative hearings in which a volunteer may defame someone 'under the guise of protecting the public.' " *Burns,* 993 P.2d at 1125 (quoting *Meyer v. Parr,* 69 Ohio App. 344, 37 N.E.2d 637, 640 (1941)). Because the same rationale applies, Arizona courts would probably extend this same balancing approach to administrative hearings in which a volunteer breached a contract by testifying. The U.S. Supreme Court has also commented on the "absoluteness" of the privilege of witness immunity in *White v. Nicholls,* 44 U.S. (3 How.) 266, 287, 11 L.Ed. 591 (1845) (emphasis added):

> It is difficult to conceive how, in a society where rights and duties are relative and mutual, there can be tolerated those who are privileged to do injury *legibus soluti;* and still more difficult to imagine, how such a privilege could be instituted or tolerated upon the principles of social good. The privilege spoken of in books should, in our opinion, be *taken with strong and well-defined qualifications.*

We recognize the vital role witness immunity plays in our judicial system; indeed, the testimony given by Dr. Cox served the public by bringing to light potential danger facing Dr. Patton's young, female patients. However, we believe the privilege of witness immunity is not absolute such as to override any and all competing interests.

## B

We now must ask whether the policies behind witness immunity, derived from cases involving suits against witnesses based in tort, apply equally to suits against witnesses based on contract. Arizona courts have not passed on this issue, and almost all witness immunity cases involve a tort action (e.g., defamation, misrepresentation). Dr. Cox brings to the attention of this Court just one case which applied absolute witness immunity to a breach of contract claim.[2] In *Combustion Sys. Servs. v. Schuylkill Energy Res.,* No. 92–4228, 1993 WL 514456 (E.D.Penn. Dec. 15, 1993), the court stated in a footnote that it was "convinced that the principles which have resulted in dismissal of tort actions applies[sic] with equal force where the ac-

2. *Bond v. Pecaut,* 561 F.Supp. 1037 (N.D.Ill. 1983), also cited by Dr. Cox, contains dicta which supports his claim. However, the court in *Bond* simply denied the plaintiff's request for leave of court to file additional counts alleging breach of an implied contract. The rest of the plaintiff's claims heard by the court all involved tort. After denying leave to add an implied contract claim, the court stated that the defendant's witness immunity "also acts as a complete defense to these[contract] claims." *Id.* at 1041. The *Bond* court did not offer a persuasive reason (or, for that matter, much of a reason at all) for its statement, and, as such, we find that *Bond* has no bearing on our determination.

tion is framed as a breach of contract." *Id.* at *5 n. 2. However, the court's analysis in *Combustion Systems* focused primarily on claims of misrepresentation, not breach of contract, and furthermore, because it is an unpublished opinion, we find it of less persuasive value.

Also relevant to our inquiry is the fact that Cox's participation in the Board's hearing was completely voluntary. Multiple jurisdictions have commented on voluntariness when applying the doctrine of witness immunity. California court denied immunity to a former employee who breached a contractual agreement of confidentiality, noting that the defendant's disclosures were not judicially compelled. *ITT Telecom Prods. Corp. v. Dooley,* 214 Cal. App.3d 307, 320, 262 Cal.Rptr. 773 (1989). Likewise, the Supreme Court of Missouri, sitting *en banc,* declared that "the rationale for witness immunity ... does not necessarily contemplate the situation of a professional who voluntarily agrees to assist a party in the litigation process for compensation." *Murphy v. A.A. Mathews,* 841 S.W.2d 671, 674 (Mo.1992).

We are also mindful that an Arizona court recognized that voluntary testimony raises special concerns that possibly counsel for less witness immunity. *See Burns,* 993 P.2d at 1125 ("Public policy dictates that th[e] need to ensure complete and truthful testimony must be balanced against extending protection to administrative hearings in which a *volunteer* may defame someone ....") (emphasis added). Although these cases involved tort claims against witnesses, we see no reason why the voluntariness analysis should not apply to breach of contract claims. *Burns* demonstrates that Arizona courts would likely find Dr. Cox's voluntary participation in the BOMEX hearing to be an influential factor in this case.

Because the witness immunity privilege "originated within the limited context of defamation law," *Murphy,* 841 S.W.2d at 675, and "should not be extended absent the existence of compelling public policy justifications," *Deatherage v. Examining Bd.,* 134 Wash.2d 131, 948 P.2d 828, 830 (1997) (citation omitted), we are persuaded that the balance of policies expressed by Arizona courts is best served by declining to extend witness immunity from contract liability arising from testimony, at least to witnesses who voluntarily testify in a quasi-judicial proceeding.

We do not believe that denying witness immunity in this limited context will undermine the policies behind the privilege. First, witness immunity cases involving breach of contract are the exception, not the rule, and we do not purport to affect the doctrine of witness immunity as it applies to tort actions.

Second, Dr. Cox voluntarily entered into an agreement whereby he would reveal the results of his evaluation as directed *only* by the Utah order, which did not contemplate BOMEX proceedings in another state.[3] He chose to limit his ability to share information he obtained about Dr. Patton, and he was not at liberty to breach his obligation even if he felt it was in the public's best interest to do so. Had Dr. Cox instead posted his findings about Dr. Patton's sexual deviancy on the BOMEX

3. While we realize that the parties dispute the existence of such an agreement, because this appeal is from a grant of Dr. Cox's motion to dismiss for failure to state a claim, we construe Dr. Patton's complaint in the light most favorable to him and take the allegations contained therein as true. *See Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.), *cert. denied,* 531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247 (2000) ("A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle it to relief.").

website to alert fellow doctors and patients, we have no doubt that Dr. Patton would have a potential breach of contract claim even though the posting would enhance the free-flow of information and protect the public. If the privilege of witness immunity were extended to actions for breach of contract, "the implication would be that any party could breach a contract with impunity simply by repudiating it in open court." *Cummings v. Beaton & Assocs. Inc.*, 249 Ill.App.3d 287, 187 Ill.Dec. 701, 618 N.E.2d 292, 312 (1992).

Third, recall that Dr. Cox not only voluntarily agreed to limit disclosure of details of the evaluation solely to circumstances contemplated by the original Utah court order, but that he also voluntarily agreed to testify in the Arizona proceeding. By limiting our holding to include only voluntary testimony, we expect courts and administrative bodies to *compel* testimony when, in their discretion, it is needed to further the truth-finding process.

Finally, although the existence of an alleged patient-psychologist relationship between Dr. Patton and Dr. Cox is immaterial to our analysis, we cannot help but consider the reasonable expectation of Dr. Patton that this extremely private information would not be disseminated beyond the scope of the Utah court order. Dr. Patton conditioned his willingness to speak to Dr. Cox upon Dr. Cox's promise not to disclose his conclusions in circumstances other than the Utah child custody proceedings. The doctrine of witness immunity cannot protect Dr. Cox, who voluntarily and for compensation broke his promise to Dr. Patton and testified at the BOMEX proceeding. The situation before us seems to be what the U.S. Supreme Court warned of when it stated that witness immunity "could never be interpreted to mean that there is a class of actors or transactions placed above the cognisance of the law, absolved from the commands of justice." *White*, 44 U.S. at 287.

### C

Therefore, applying our perception of Arizona law, we hold that witness immunity does not bar an action for breach of contract when, as in this case, the witness participated voluntarily in a quasi-judicial proceeding. This ruling will not hinder "the resolution of disputes and the ascertainment of truth," *Edwards v. Centex Real Estate Corp.*, 53 Cal.App.4th 15, 61 Cal.Rptr.2d 518, 529 (1997), because witnesses can be compelled to testify as needed, which would then trigger immunity protection.

## IV

Accordingly, the district court's order granting defendant's motion to dismiss is REVERSED and the case is REMANDED to the district court for further consideration and to determine whether Dr. Michael Cox entered into and subsequently breached a contractual agreement of confidentiality with Dr. Mark Patton.

HARLINGTON WOOD, JR., Circuit Judge, dissenting:

The majority opinion is thoughtful and well written. I view this as a close case, but I believe the Arizona district court was correct and would affirm. Involved is a question of Arizona law relating to the immunity of a witness, Dr. Cox, now deceased, with his estate substituted as defendant. Dr. Cox testified in 1998 at a disciplinary hearing of the Arizona Board of Medical Examiners ("BOMEX") involving plaintiff, Dr. Patton, who practices pediatric medicine.

The background facts are set out in the majority opinion which interprets existing Arizona law to preclude immunity to Dr. Cox. However, if the Arizona Supreme

Court were to consider the circumstances in this case, some of which I will explain, I am not reluctant to predict that it would grant immunity to Dr. Cox.

Dr. Patton does not dispute either the accuracy or truth of Dr. Cox's testimony before BOMEX, and concedes that witnesses ordinarily have absolute immunity in respect to their testimony, including at quasi-judicial proceedings.

There is no need to pursue the factual background, but there are some details which I believe need to be emphasized. Dr. Patton was not a patient of Dr. Cox which would have allowed Dr. Patton to invoke the confidentiality of a doctor-patient relationship. The examination of Dr. Patton by Dr. Cox was pursuant to a 1998 order of a Utah state court in a divorce case pending between Dr. Patton and his former wife. The primary issue was the sexual abuse by Dr. Patton of his teenage sister-in-law as that abuse related to child visitation and custody issues. Dr. Cox was a licensed psychologist and associate professor of psychiatry at Baylor College of Medicine in Houston, Texas. He was well known in his areas of expertise, including sexual abuse and sex offender issues. The sordid details of the relationship between Dr. Patton and the teenager are conceded by plaintiff and need not be detailed here, except to note that Dr. Cox diagnosed the plaintiff as possessing characteristics of a sex offender, a pedophile with personality disorders.

Just before Dr. Cox was to perform his evaluation of Dr. Patton, Dr. Patton claims he asked Dr. Cox to keep confidential the results of the court-ordered examination. Dr. Cox explicitly denied he entered into any such agreement with Dr. Patton. I see no need to reach this issue, but even if we assume such an agreement existed, it could have no validity as it lacked consideration since the examination was being done under court order. If Dr. Patton was concerned about adverse publicity, and he had already had considerable, he might have asked the Utah court to condition or qualify its order, but he did not. The Utah court was best suited to interpret its own order. As it turned out, Dr. Cox was never called to testify in Utah as the divorce case was settled.

Later, after the evaluation of Dr. Patton, Dr. Cox stated that he was contacted by an Arizona assistant attorney general to come to Arizona to testify at the BOMEX hearing concerning Dr. Patton's fitness to practice medicine. A complaint had been filed with the Board by Dr. Patton's former sister-in-law, the victim of his previous sexual abuse. Dr. Cox complied, went to Arizona, and appeared as an expert called by the State. He was compensated accordingly. The BOMEX resulting Order of February 3, 1999, found that Dr. Patton had engaged in unprofessional conduct and imposed discipline as follows:

1. Respondent is placed on probation for a minimum of five years;

2. Respondent shall always have a female chaperone present when he examines female patients and the chaperone shall initial the patient's chart at the time of the examination;

3. Respondent shall undergo psychotherapy with a Board approved therapist. The therapist shall provide the Board with quarterly reports;

4. Respondent shall practice in a structured practice setting; and,

5. Respondent is prohibited from examining the breast and genitalia of female patients 10 years of age and older.

It is inconceivable to me that as a matter of public policy so closely related to the health and safety of citizens of Arizona that the Arizona Supreme Court would strip Dr. Cox of his immunity and subject

him to possible penalties. Otherwise witnesses would be reluctant to testify, or might tend to distort their testimony. In a child custody case from my own state, *Bond v. Pecaut,* 561 F.Supp. 1037, 1039 (N.D.Ill.1983), the district court noted, "In the final analysis, we think that public policy is served if persons with knowledge of relevant facts can report to the courts without fear of civil liability." *See also Briscoe v. LaHue,* 460 U.S. 325, 332–33, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). In discussing absolute immunity of witnesses, the Supreme Court held that the dictates of public policy suggest that a witness without immunity might "be inclined to shade his testimony in favor of a potential plaintiff," and in so doing "deprive the finder of fact of candid, objective and undistorted evidence." *Id.* at 333, 103 S.Ct. 1108. In Arizona's inquiry into the fitness of one of the state's licensed doctors, the full unslanted truth would be crucial to protect the health and welfare of its citizens.

Public policy reasons are more than adequate in the circumstances of this case to support immunity. I do not regard this case as a mere private contract dispute based upon, at best, a very dubious alleged contractual relationship claimed by Dr. Patton and completely denied by Dr. Cox. To deprive Dr. Cox of immunity in these circumstances would be a great disservice not only to Dr. Cox but to the citizens of Arizona.

I must respectfully dissent.