## COMMERCIAL CAPITAL BANKCORP, INC.

v.

## ST. PAUL MERCURY INSURANCE COMPANY

### No. SACV05–1141 CJC RNBX.

United States District Court,
C.D. California.

Jan. 23, 2006.

Larry Caldwell, Caldwell and Associates, Roseville, CA, for Plaintiff.

David J. Billings, David T. Dibiase, McPharlin & Conners, Los Angeles, CA, Michael R. Goodstein, Bailey Cavalieri, Columbus, OH, for Defendant.

CARNEY, District Judge.

**PROCEEDINGS: (IN CHAMBERS) ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (filed 11/21/05)**

Plaintiff, the insured on a directors' and officers' and company liability insurance policy issued by Defendant, moves for summary judgment in its favor on the issue of whether Defendant owes a duty to advance on a current basis 100 percent of the reasonable attorneys' fees and costs Plaintiff becomes obligated to pay in defending itself, its subsidiary, and several officers and employees in a currently-ongoing lawsuit. Because Defendant has no contractual or other duty to advance those

fees and costs on a current basis, Plaintiff's motion is DENIED.

**A. Background**

**1. The Policy**

Defendant St. Paul Mercury Insurance Company issued Plaintiff a directors' and officers' and company liability policy (the "St. Paul Policy"), with a policy period of June 4, 2005 to June 4, 2006. (Plaintiff's Exh. A.) The policy has a $20,000,000 limit of liability, and provides for a retention amount of either $500,000 or $250,000 depending on the type of underlying claim for which liability coverage is sought and the applicable insuring agreement. The policy further provides in relevant part:

**A. Company Indemnification Coverage**

[T]he Insurer shall pay on behalf of [Plaintiff and its subsidiaries] Loss for which [Plaintiff and its subsidiaries] grant[ ] indemnification to the Insured Persons, as permitted or required by law, and which the Insured Persons have become legally obligated to pay on account of any Claim[, defined as any written demand for monetary damages, civil proceeding, or formal civil administrative or regulatory proceeding against any Insured Person] first made against them, individually or otherwise, during the Policy Period ... for a Wrongful Act taking place before or during the Policy Period. (Plaintiff's Exh. A, § I.B.) [1]

"Loss" is defined as:

the amount which the Insured Persons ... become legally obligated to pay on account of each Claim ... made against them for Wrongful Acts for which cover-

---

[1] The parties do not dispute that the coverage at issue in this case is Insuring Agreement B, or "Company Indemnification Coverage." Insuring Agreements A and C provide for, respectively, Directors and Officers Individual Coverage and Company Securities Claim Liability Coverage. (Plaintiff's Exh. A, § I.)

age applies, including, but not limited to, damages, judgments, settlements and Defense Costs. Loss does not include (1) any amount for which the Insured's are absolved from payment, (2) taxes, fines or penalties imposed by law (3) the multiple portion of any multiplied damage award or punitive or exemplary damages incurred by Insured Persons, or (4) matters uninsurable under the law pursuant to which this Policy is construed. (*Id.* at § III.J.)

"Defense Costs" is defined as:

that part of Loss consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the Company) incurred in defending or investigating Claims and the premium for appeal, attachment or similar bonds. (*Id.* at § III.D.)

"Insured Persons" is defined as:

1. any one or more persons who were, now are or shall be duly elected or appointed directors or officers of the Company[, defined as Plaintiff and its subsidiaries] ...; [and]

3. any one or more natural persons described in subparagraph (1) above who were, now are or shall be serving in an Outside Position [2] (*Id.* at § III.H.)

"Insured Persons" does not include employees of Plaintiff other than duly elected or appointed directors or officers. (*Id.* at § III.H.2.; Declarations Page Item 2.)

---

**2.** "Outside Position" is defined as the position of director, officer, manager, trustee or other equivalent executive position held by any duly elected or appointed director or officer of the Company in:

    1. any Non–Profit Entity ... or

"Insureds" is defined as: "[e]ither in the singular or the plural, ... the Insured Persons and ... with respect to Insuring Agreement[ ] B, the Company." (*Id.* at § III.G.)

"Wrongful Act" is defined as:

1. any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any of the Insured Persons in their capacity as such, or in an Outside Position ... or

2. Any matter claimed against the Insured Persons solely by reason of their serving in such capacity or in an Outside Position. (Plaintiff's Exh. A, at § III.S.)

The policy further provides, under the definition of "wrongful act:"

Except as may be otherwise specifically provided in this Policy, Wrongful Act does not include any conduct actually or allegedly committed or attempted by Insured Persons in their capacity as a director, officer, trustee or employee of any organization other than the Company, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by, the Company.

In Section V., entitled "GENERAL CONDITIONS AND LIMITATIONS," the policy contains the following provisions:

**B. Defense and Settlement**

Subject to this Subsection V.D., it shall be the duty of the Insureds and not the duty of the Insurer to defend any Claim.

---

    2. any other entity, if such coverage is specifically granted by endorsement to this Policy,

if service in such position is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by, the Company.

The Insureds agree not to settle or offer to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Insurer's written consent. The Insurer shall not be liable for any settlement, Defense Costs, assumed obligation or admission to which it has not consented.

.    .    .    .    .

Subject to Section V.E. of this Policy, the Insurer shall advance on behalf of the Insureds Defense Costs which the Insured Persons ... have incurred in connection with Claims made against them, prior to disposition of such Claims, provided that to the extent it is finally established that any such Defense Costs are not covered under this Policy, the Insureds ... agree to repay the Insurer such Defense Costs.

## C. Allocation

If in any Claim the Insureds incur Loss jointly with others, including the Company with respect to any Claim not covered under Insuring Agreement C, or incur an amount consisting of both Loss covered under this Policy and loss not covered by this Policy because the Claim includes both covered and uncovered matters, then the Insureds and the Insurer shall allocate such amount between covered Loss and uncovered loss based upon the relative legal exposures of the parties to covered and uncovered matters.

If there can be an agreement on an allocation of Defense Costs, the Insurer shall advance on a current basis Defense Costs allocated to covered Loss. If there can be no agreement on an allocation of Defense Costs, the Insurer shall advance on a current basis Defense Costs which the Insurer believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined.

## 2. The Underlying Action

During the Policy Period of the St. Paul Policy, fourteen officers of Plaintiff and/or its subsidiary were named as defendants in a civil action filed in California Superior Court by Comerica Bank (the "Comerica suit"). (UDF Nos. 13–18.)[3] Comerica's Complaint alleged that an executive vice president of Plaintiff, thirteen officers of Plaintiff's subsidiary, and ten of the subsidiary's employees misappropriated Comerica's confidential trade secrets and confidential customer information to divert customers and business away from Comerica and towards Plaintiff and its subsidiary. (Plaintiff's Exhs. C, D.) The causes of action in the complaint are (1) misappropriation of trade secrets, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, (4 and 5) intentional interference with employee relationships, (6) intentional interference with economic advantage, (7) conversion, (8) breach of fiduciary duty, (9) constructive fraud, (10) unfair competition, (11) constructive trust, (12) conspiracy, and (13) injunctive relief. (Plaintiff's Exhs. C, D.)[4] The causes of action for misappropriation of trade secrets, intentional interference with employment relationships, intentional interference with economic advantage, conversion, breach of fiduciary duty, and constructive fraud each allege that the Comerica defendants acted "willfully" and with intent to cause

---

**3.** "UDF" refers to Plaintiff's Separate Statement of Uncontroverted Facts submitted in support of its Motion for Summary Judgment.

**4.** A First Amended Complaint was filed in the Comerica suit, containing the same causes of action as in the original Complaint.

injury to Comerica in committing the alleged illegal acts. (Plaintiff's Exh. D, ¶¶ 82, 105, 112, 122, 130, 135, 143.) The Complaint also alleges that the Defendants conspired with each other "to deliberately disrupt Comerica's business through the unlawful misappropriation of Comerica's Trade Secrets and Confidential Information" and the alleged use of that information to solicit Comerica's employees and current and prospective customers, and usurpation of Comerica's business opportunities. (*Id.* at 152.) The Complaint seeks damages, restitution, and injunctive relief. (UDF No. 22.)

Plaintiff has been providing a defense in the Comerica suit for its officer, the thirteen, officers of its subsidiary, the defendant employees, its subsidiary, and itself. (UDF 23.) On August 8, 2005, Plaintiff gave Defendant written notice of the Comerica suit. (UDF 24.) On September 16, 2005, Defendant sent Plaintiff a letter stating that certain defendants in the Comerica suit appeared to be "insured persons" under the St. Paul Policy, and that some claims in the suit appeared to be covered. (Plaintiff's Exh. B, p. 6.) The letter also stated, however, that the intentional interference with economic advantage, intentional interference with employee relationships, conversion, and constructive fraud claims appeared not to be covered because the St. Paul policy "was not meant to cover intentional torts as alleged by Comerica." (*Id.* at p. 7.) The letter also stated that the Comerica Complaint appeared to seek damages not covered by the St. Paul Policy and to allege conduct outside the scope of the policy to the extent it was based on

acts committed by the covered directors and officers before they became employed by Plaintiff and its subsidiary. (*Id.*) Pursuant to Section V.D. and V.E. (the "Defense and Settlement" and "Allocation" sections) of the St. Paul Policy, Defendant proposed allocating 50 percent of Plaintiff's Defense Costs in the Comerica suit to covered claims. (*Id.* at p. 9.) Defendant stated that it would begin to reimburse Plaintiff for its defense expenditures "based on an allocation of fifty percent (.50) of defense costs incurred." (*Id.*)

Plaintiff subsequently asked Defendant to pay 100 percent of Plaintiff's defense costs in the Comerica suit on a current basis, "subject to deferred resolution of [Defendant's] claimed right to allocation of defense costs." (UDF No. 29.) Defendant refused, insisting that it had an obligation to pay only 50 percent. (UDF No. 30.) Plaintiff filed its complaint for declaratory judgment in this Court on November 21, 2005, asserting a single claim for declaratory relief. In that claim Plaintiff seeks to have this Court declare, among other things, that Defendant "owes a duty to pay 100% of the reasonable Defense Costs (including attorneys' fees and litigation costs) that [Plaintiff] has incurred and will incur in providing a defense to [all defendants] in the Comerica Bank Lawsuit, when those Defense Costs are incurred," and that Subsection V.E. of the St. Paul Policy is unenforceable to the extent it allows St. Paul to do otherwise. (Complaint, ¶ 37(a)-(d).) Plaintiff now seeks summary judgment as to those issues.[5]

---

**5.** Plaintiff also alleged in its moving papers that there was a "dispute" regarding whether Defendant could require Plaintiff to provide a "written undertaking" promising to repay defense costs later determined not to be covered under the St. Paul Policy. Plaintiff states on reply, however, that the parties have resolved this issue. The parties also allege that resolution has been reached as to another "dispute" Plaintiff identified in its moving papers—the amount of the applicable retention under the St. Paul Policy. Plaintiff presents no arguments as to the applicable retention. Conse-

As explained below, the Court finds that Subsection V.E. is valid and enforceable under California law and, based on that section and the parties' apparent understanding, Defendant has no duty to pay 100 percent of Plaintiff's attorneys' fees and litigation costs incurred in the Comerica suit on a current basis.

## B. Standard on Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In making a summary judgment determination, the Court must view the evidence presented in the light most favorable to the non-moving party, drawing "all justifiable inferences . . . in his favor." *Id.* at 255.

## C. Application

■ As the Court's jurisdiction is founded on diversity, and no party suggests that the law of any state other than California should apply, California law governs this Court's determination of Defendant's duties under the St. Paul Policy. *See Patton v. Cox*, 276 F.3d 493, 495 (9th Cir.2002) ("When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law."); *Washington Mutual Bank, F.A. v. Superior Court*, 24 Cal.4th 906, 919, 103 Cal.Rptr.2d 320, 15

P.3d 1071 (2001) (*citing Bernhard v. Harrah's Club*, 16 Cal.3d 313, 317–18, 128 Cal. Rptr. 215, 546 P.2d 719 (1976)) (" '[G]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state.' ") Under California law, courts "do not rewrite any provision of any contract, [including an insurance policy], for any purpose." *Rosen v. State Farm General Insurance Co.*, 30 Cal.4th 1070, 1073, 135 Cal.Rptr.2d 361, 70 P.3d 351 (2003) (*quoting Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal.4th 945, 968, 103 Cal.Rptr.2d 672, 16 P.3d 94 (2001)). "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Id.* (*quoting Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992)). Interpretation of a contract is governed by "the mutual intention of the parties at the time the contract is formed," and policy language controls where it is "clear and explicit." *Id.*

■ Here the parties explicitly provided in subsection V.E. that, if the "Insureds"— *i.e.* Plaintiff and its subsidiaries and their directors and officers—incur "Loss," including Defense Costs—jointly with others, or incur "an amount consisting of [covered] Loss" and uncovered "loss"—*i.e.* in defending an suit seeking covered and uncovered claims—and the parties are unable to apportion Plaintiff's amounts spent for defense among the covered and uncovered claims, Defendant will only "advance on a current basis" those amounts Defendant believes to be covered under the St. Paul Policy. (Plaintiff's Exh. 1, V.D., V.E.) The St. Paul Policy clearly defines "Loss," to include "reasonable costs, charges, fees . . . and expenses . . . incurred in defend-

quently, the Court does not address the un-

dertaking or retention issues in this Order.

ing or investigating Claims," arising from specified acts by directors and officers of Plaintiff and its subsidiaries, that Plaintiff, its subsidiaries, or their officers or directors become obligated to pay on account of those Claims. (Plaintiff's Exh. 1, § I.B.) The St. Paul Policy also expressly states that Defendant has no duty to defend Plaintiff, but that, "subject to Subsection V.E.," certain Defense Costs will be advanced on a current basis. (Plaintiff's Exh. 1, § V.D.) Subsection V.E., in turn, provides a specific rule applicable to "mixed" actions, where Defense Costs are incurred in defending against covered and uncovered claims. (*Id.* at § V.E.) If, in such a situation, no allocation agreement can be reached, Defendant will advance only those "Defense Costs which [Defendant] believes to be covered under this Policy until a different allocation is negotiated, arbitrated or judicially determined." (*Id.* at § V.E.)

Plaintiff makes several arguments against this result. First, Plaintiff argues that California and Ninth Circuit precedent compels St. Paul to advance all Defense Costs on a current basis regardless of policy language to the contrary. Plaintiff cites the Ninth Circuit's decisions *Okada v. MGIC Indemnity Corp.*, 823 F.2d 276 (9th Cir.1986) and *Gon v. First State Insurance Co.*, 871 F.2d 863 (9th Cir.1989). The Court will address these cases in turn.

In *Okada*, the Ninth Circuit addressed a Directors and Officers Errors and Omissions insurance policy. *Okada*, 823 F.2d at 278. Under the policy, the insurer agreed to pay "all Loss [including amounts paid for defense of legal actions] which [the Plaintiff insured directors] ... shall become legally obligated to pay." *Id.* In Section 5, entitled "COSTS, CHARGES AND EXPENSES," subsection (a) stated that "[n]o costs, charges and expenses shall be incurred ... without the Insurer's

consent." *Id.* at 279. Subsection 5(b) provided, "[t]he Insurer may at its option ... advance on behalf of the Directors or Officers ... expenses which they have incurred in connection with claims made against them, prior to disposition of such claims...." *Id.* The issue before the Ninth Circuit was whether the policy required the insurer to pay the insured's defense costs as they came due. The Ninth Circuit held the insurer had such a duty, but not because such a duty applied in all cases. Rather, the Ninth Circuit reasoned that, although the default rule in liability contracts providing for defense costs is that the insurer must pay defense costs as they came due, the parties can contract around this rule. The Ninth Circuit noted that subsection 5(c) exempted "expenses" from the default rule of contemporaneous payment, but held that "expenses" did not appear to cover all "defense costs" because subsection 5(a) referred to "costs, charges and expenses." *Id.* at 280–282. The Ninth Circuit acknowledged, however, that the contract did exempt "expenses" from the contemporaneous payment rule, and stated that other defense costs also would be exempt if the insurer had done a better job of drafting: "[w]ere the effect of the 'small print' exception clear, we could not uphold the district court's interpretation [t]hat contemporaneous payment was required." *Id.* at 281. Because—and only because—subsection 5(c) was ambiguous, the Ninth Circuit construed it against the drafter by applying Hawaii's strict rule to that effect. *Id.*

*Okada* has no application to this case. Unlike the "expenses" in *Okada*, the "Defense Costs" subject to the subsection V.E. Allocation provision are clearly defined in the Definitions Section. (Plaintiff's Exh. 1, § III.D.) There is no ambiguity as to the meaning of "Defense Costs," and no discrepancy between the amounts covered in the Allocation provision and the amounts

as to which the Insured must get the Insurer's written consent pursuant to subsection V.D. Indeed, *Okada* clearly states that a properly-drafted contract provision such as the one in this case would abrogate the default rule of contemporaneous payment. *Id.* at 281 (noting that a particular Lloyd's of London insurance form expressly defines "defense costs," and "avoid[s] the confusion that is [the insurer's] downfall here.")

*Gon* is similarly inapposite. In that case, the Ninth Circuit addressed a Directors' and Officers' liability policy that, unlike *Okada,* had no provision seeking to exclude legal expenses from expenses to be paid as incurred. *Gon,* 871 F.2d 863, 868 (9th Cir.1989). The absence of any such provision was significant to the Ninth Circuit, and made Gon an "easier case" than *Okada.* *Id.* It was "as a result" of the absence of any contrary contractual provision that the Ninth Circuit applied the default rule that an insurer under a liability policy. must pay defense costs as they are incurred. *Id.* at 868. The Ninth Circuit's further holding that the insurer had to advance all of the insured's legal fees was based on a finding that apportionment was not feasible. *Id.* at 869. However, the policy in issue contained no express provision like the one in this case, providing for a contrary result when apportionment is not possible. Because the parties in this case, unlike the parties in *Gon,* provided in their contract for situations where apportionment could not be made in an action asserting covered and uncovered claims, *Gon* does not apply.

■ *Okada's* and *Gon's* inapplicability to a contract expressly providing for allocation of defense costs is supported by a recent case from the Southern District. *Pan Pacific Retail Properties, Inc. v. Gulf Insurance Co.,* 2004 WL 2958479 (S.D.Cal., July 14, 2004) involved a directors' and officers' liability insurance policy with an allocation provision almost identical to the one in this case. The plaintiff in that case made the same argument Plaintiff makes here: that "California law provides that a duty to reimburse requires reimbursement on a current basis," even if the parties to the insurance policy expressly provide otherwise. *Id.* at \*12. The court rejected the plaintiff's argument, distinguishing *Okada* on the ground that the court there "specifically pointed out that if the language of the policy had been clear a different result would follow," and stating that *Gon* did not establish any "bright line rule that a D & O insurer must always reimburse all costs contemporaneously, regardless of the terms of the individual insurance policy." *Id.* at \*14. The Court agrees with *Pan Pacific* that parties may "contract out" of the default rule of contemporaneous payment of defense costs.

■ Plaintiff also relies on *Buss v. Superior Court,* 16 Cal.4th 35, 65 Cal. Rptr.2d 366, 939 P.2d 766 (1997), which addressed an insurer's duties under a contract containing a duty to defend, to argue that California public policy requires the Court to hold subsection V.E. invalid. As an initial matter, the Court notes that California law generally prohibits courts from invalidating express contractual provisions in favor of broad public policy considerations. *Rosen,* 30 Cal.4th at 1076–77, 135 Cal.Rptr.2d 361, 70 P.3d 351 (declining to broaden, on public policy grounds, contractual definition of "collapse" as "actually fallen down or fallen into pieces."). Even apart from this rule, however, *Buss* is inapposite to the extent it expresses any "public policy" in favor of requiring an insurer under a "duty to defend" policy prophylactically to defend all claims in a "mixed" action.

*Buss* involved a commercial general liability insurance policy that expressly pro-

vided that the insurer had a duty to defend the insured against suits seeking covered damages. *Buss,* 16 Cal.4th at 41, 65 Cal. Rptr.2d 366, 939 P.2d 766. The court held that, in a "mixed" action where some claims are at least potentially covered, the insurer had a duty to defend the entire "mixed" action prophylactically and could not "parse" claims. *Id.* at 48–49, 65 Cal. Rptr.2d 366, 939 P.2d 766. The reason for this holding was that the insured under a policy containing a duty to defend pays premiums for the right to a defense. It would defeat the intent of the contracting parties and rob the insured of its paid-for right to a defense if the insurer could delay payment while it attempted to distinguish covered from uncovered claims, and also would allow the underlying plaintiff to control the extent of the insured defendant's coverage. *Id.* at 49, 65 Cal.Rptr.2d 366, 939 P.2d 766.

*Buss* has no application here, because its rule is based entirely on the existence of a contractual duty to defend. The St. Paul Policy in this case contains no such duty. Indeed, the parties in this case expressly contracted that, subject to subsection V.D. and V.E.'s advancement and allocation provisions, *"it shall be the duty of the Insureds and not the duty of the Insurer to defend any Claim."* (Plaintiff's Exh. 1, § 5.D.) Thus, rather than paying premiums for the right to a defense of all potentially covered claims, Plaintiff in this case paid (presumably lower) premiums for a lesser right. What Plaintiff agreed and bargained for was nothing more than the right to allocate Defense Costs to covered and uncovered claims and, if no such allocation could be agreed on, to have Defendant advance whatever Defense Costs it

believed were covered subject to a later allocation determination. To require Defendant to advance all of Plaintiff's defense costs on a current basis despite subsection V.E.'s clear indication of the parties' contrary intent would give Plaintiff an unbargained-for windfall. Indeed, *Buss* acknowledges that even in "duty to defend" contracts the parties may modify that duty by agreement. *Buss* at 58, 65 Cal.Rptr.2d 366, 939 P.2d 766. In such a situation, the *Buss* court stated, "if a modification of this sort is agreeable to the parties, a stranger to the contract should generally not be heard to complain." *Id.* In short, as no "duty to defend" was bargained for in this case, *Buss'* public policy rationale has no application.[6]

Plaintiff further argues that Sections V.D. and V.E. are ambiguous and that, to the extent they purport to diminish Plaintiff's right to contemporaneous payment of Defense Costs, they should be enforced against the insurer. Plaintiff contends that Subsection V.D. leads the insured to "reasonably expect" that Defendant will advance all Defense Costs "prior to disposition of Claims against Insured Persons," Plaintiff contends that, since subsection V.D. provides for reimbursement of uncovered costs to the insurer after final disposition of the action, a reasonable insured would understand subsection V.E.'s Allocation provision to mean that the allocation of defense costs must occur after "there ha[s] already been both a final resolution of the underlying lawsuit and a final determination by agreement, arbitration or adjudication, of the insurer's entitlement to allocation." (Motion, p. 21.)

---

**6.** The other cases Plaintiff cites in support of its public policy argument are similarly unavailing because, like *Buss,* they both involved insurance policies with express "duty to-defend" provisions. *Anthem Electronics, Inc. v.* *Pacific Employers Insurance Co.,* 302 F.3d 1049, 1056 (9th Cir.2002), *Upper Deck Co., LLC v. Federal Insurance Co.,* 358 F.3d 608, 614 (9th Cir.2004).

Plaintiff's ambiguity argument fails. First, the portion of subsection V.D. that provides for advancement of Defense Costs is clearly qualified by the phrase "Subject to Section V.E.," the Allocation subsection. That Allocation provision clearly provides specific rules for suits involving covered and uncovered claims. The qualifying phrase "subject to Section V.E.," appears at the beginning of the paragraph in subsection V.D. that addresses advancement of defense costs, so that the reader is promptly alerted to the fact that advancement is subject to a limitation contained in the next section. Nor does Subsection V.D. otherwise lead the reader to believe that the insurer has any general duty to defend: the first sentence of subsection V.D. states that "it shall be the duty of the *Insureds* and *not the duty of the Insurer* to defend any Claim." (Plaintiff's Exh. 1, § V.D.) (emphasis added.) Subsection V.E., the provision that qualifies subsection V.D., is not placed in any inconspicuous position, but follows immediately after it. The most obvious interpretation of subsection V.D. is that Defendant's duty to advance Defense Costs exists subject to the apportionment provision that follows.[7]

Indeed, to read subsection V.E. to require anything except apportionment of Defense Costs before resolution of the underlying action, and before Defendant's advancement of those costs, would be nonsensical. To say that Defendant had a duty to advance all defense costs prior to disposition of the action, and that subsection V.E. allocation could only occur after final judgment, would render meaningless the provision of subsection V.E. that allows Defendant to "*advance*" less than 100 percent of Defense Costs "*on a current basis.*" If subsection V.E. required the insurer to wait until after judgment to make downward adjustments in the amount of

---

7. Plaintiff also contends that the phrase "the relative legal exposure of the parties to covered and uncovered matters" in subsection V.E. would lead a reasonable insured to expect that any allocation would have to occur after final resolution of the lawsuit, because the parties' relative "exposure" cannot be determined before then. (Motion, p. 20.) However, "exposure" is different from a final determination of liability, and courts often make findings on parties' "exposure" in the absence of such final determinations. In *Raychem Corp. v. Federal Insurance Company*, 853 F.Supp. 1170 (N.D.Cal.1994), for instance, the court noted that some circuits apply a "relative exposure" rule in determining the proper allocation of settlement payments among insured and uninsured parties joined as defendants on a same claim. *Raychem*, 853 F.Supp. at 1180. This rule, applied after settlement, allocates "according to the relative risk of exposure of the various parties involved." *Id.* "Exposure" is different than actual determination of individual liability; once there has been a settlement, which does not distinguish among individual defendants' liability, any determination of the likely "exposure" the individual defendants would have

faced had the case gone to trial necessarily is speculative. Nevertheless, it is still possible to estimate the "exposure" each defendant faced based on their relative involvement in the alleged wrongful conduct and other factors. *See, e.g., Nodaway Valley Bank v. Continental Casualty Co.*, 916 F.2d 1362, 1367 (8th Cir.1990) (upholding district court's determination that, based on insured and uninsured defendants' relative likelihood of being found liable for the alleged wrongful acts had the underlying action gone to trial, the appropriate allocation of "exposure" was 90 percent to insured parties and 10 percent to uninsured parties). Thus, Plaintiff is incorrect that no determination of parties' relative "exposure" may be made prior to resolution of the case. In light of the fact that subsection V.E. provides that where the parties cannot agree on an allocation the insurer will provide on a "current" basis costs it reasonably believes to be covered, subject to a later determination on the issue, the phrase "the relative legal exposure of the parties" is most reasonably understood to mean the parties' relative likelihood of being found liable should the case proceed to judgment.

defense costs it provided, those downwardly-adjusted Defense costs would not be "advance[d]," and the provision of those costs would not be "on a current basis" because all Defense Costs would already have been incurred earlier in the action. Moreover, there would be no need for the insurer to provide any downwardly-adjusted Defense Costs, as the insurer presumably would already have paid all of those Defense Costs "on a current basis" while the litigation was ongoing, pursuant to subsection V.D. Under Plaintiff's reading, the insurer apparently would have to advance all costs before final judgment, and then after judgment it somehow would "advance" costs the Plaintiff already had expended to the extent the insurer believed them to be covered, only to have the insurer's obligations altered once again when "a different allocation [was] negotiated, arbitrated, or judicially determined." In addition to rendering the words "advance" and "on a current basis" meaningless, such an interpretation is simply unworkable. The parties' clear intent, as reflected in subsections V.D. and V.E., is that where a lawsuit asserts both covered and uncovered claims, or where "Insureds" incur "Loss," including Defense Costs, "jointly with others," and no apportionment agreement can be reached, the only Defense Costs that Defendant need advance on a current basis—*i.e.* during the pendency of the litigation—are those it believes to be covered, until a different allocation is reached later by negotiation, arbitration, or judicial decision.[8]

■ Plaintiff's argument that subsection V.E. is unenforceable because it is inconspicuous also fails. Plaintiff cites *Haynes v. Farmers Insurance Exchange*, 32 Cal.4th 1198, 13 Cal.Rptr.3d 68, 89 P.3d 381 (2004) for the proposition that an insurance coverage exclusion that diminishes coverage should not be enforced if it is not conspicuously placed and written in a " 'plain and clear' fashion." *Haynes* is clearly distinguishable, however. That case involved an auto insurance policy in which an endorsement limiting coverage for permissive auto users was buried in a long list of provisions, and the Declarations page of which merely listed the excluding endorsement by an obscure alphanumeric identifier containing no hint that it limited coverage. *Id.* at 1206–07, 13 Cal.Rptr.3d 68, 89 P.3d 381. No such hard-to-find exclusion exists in this case.

---

8. Plaintiff also argues that "given the tough burden of proof an insurer must meet in order to secure a right to allocation of defense costs ... a reader of [the Allocation provision] would reasonably understand the provision to mean that the insurer would only have the right to deduct a portion of defense costs from its payment of 100% of defense costs as incurred, if the insurer had proof based on undisputed acts that a portion of defense costs related solely to the defense of an uncovered claim or solely to the defense of an uninsured defendant." (Motion, p. 21.) Plaintiff cites *Raychem* for the proposition that an insurer cannot recover defense costs paid to an insured under a "duty to pay" policy unless it proves that the defense costs were incurred independent of any reasonable relation to the defense of covered claims. This argument fails, First, *Raychem* explicitly stated that it does not apply to allocation of defense costs between covered and uncovered claims, but only to allocation among covered and uncovered *defendants* joined in the same claim. *Raychem*, 853 F.Supp. at 1171. *Raychem* also did not address the issue of contemporaneous payment, but only addressed reimbursement of an insurer for defense costs it already has paid to the insured during defense of the action. *Id.* at 1174. Moreover, the fact that it is difficult for an insurer to establish after the fact that it is entitled to reimbursement for certain defense costs does nothing to diminish the effect of subsection V.E., which permits Defendant in the case of a "mixed" action preliminarily to determine the extent of coverage for purposes of advancing defense costs where the parties cannot agree on allocation.

Subsection V.E. is clearly stated, and directly follows subsection V.D. Both subsections appear where one would reasonably expect, in the section entitled "General Conditions and Limitations," and the title of section V. is clearly written in all bold letters and underlined. No alphanumeric references are used to identify subsection V.E.'s Allocation provision, it is not "buried," and the language "subject to Section V.E. of this Policy," which appears at the beginning of subsection V.D.'s provision on defense cost advancement, clearly tells the insured to look to the next section for modifying language. Thus, *Haynes'* rule requiring "conspicuous placement of exclusionary language" does not invalidate subsections V.D. or V.E. of the St. Paul Policy.

■ Having determined that subsection V.E. is valid and enforceable, the Court must now determine whether this is a case in which subsection V.E. allows Defendant to advance only that part of Plaintiff's Defense Costs that Defendant believes to be covered. The "trigger" for Subsection V.E.'s "believes to be covered" provision is that a complaint must assert both covered and uncovered claims, and/or "Insureds" must "incur Loss jointly with others," and the parties must be unable to reach agreement on apportionment of Defense Costs. (Plaintiff's Exh. 1, § V.E.) Here, the Comerica suit alleges both covered and uncovered claims. The St. Paul Policy only states that St. Paul will pay "Loss," which is defined to exclude "matters uninsurable under the law pursuant to which this Poli-

cy is constructed." [9] (Plaintiff's Exh. 1, § III.J.) California Insurance Code Section 533 states that "[a]n insurer is not liable for a loss caused by the willful act of the insured." CAL. INS. CODE § 533. As several of the causes of action in the Comerica suit allege willful conduct undertaken with intent to cause injury to Comerica, no coverage exists as to at least some of the acts alleged. In addition, the Comerica Complaint is based at least partly on acts allegedly taken by Plaintiff's Executive Vice President, James R. Daly, while he was still employed as Comerica's Executive Vice President and the Director of Comerica's Financial Services Division. (Plaintiff's Exh. C, ¶ 6.) The St. Paul Policy states that "Wrongful Act does not include any conduct actually or allegedly committed . . . by Insured Persons in their capacity as a director, officer . . . or employee of any organization other than the Company, even if service in such capacity is with the knowledge and consent of, at the direction or request of, or part of the duties regularly assigned to the Insured Person by, the Company." (Plaintiff's Exh. A, § III.S.) Hence, the Comerica suit alleges both covered and uncovered claims, so as to bring it within subsection V.E.[10] It is undisputed that the parties have been unable to agree on an allocation of Defense Costs. Thus, under subsection V.E., Defendant need only advance on a current basis those Defense Costs it believes to be covered under the St. Paul Policy until a different allocation is negotiated, arbitrated, or judicially determined.[11]

---

**9.** As the Court applies California law to determine Defendant's obligations under the St. Paul Policy, California law is the "law under which [the St. Paul Policy] is constructed" for purposes of this case.

**10.** Defendant also alleges that the Comerica suit involves claims against both insured and uninsured parties. The Court makes no findings on this issue, as the Court's determina-

tion that the Comerica suit involves both covered and uncovered claims is sufficient to invoke the application of Subsection V.E.'s apportionment clause.

**11.** Plaintiff alleges that St. Paul "acknowledged in its [September 16, 2005] reservation of rights letter [that] 'no definitive assessment of coverage can be completed until final disposition of the Claim . . . when all the facts

## D. Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED.

are known' … and 'there is no easy formula that lends itself to allocation' of defense costs." (UDF Nos. 25–27.) Plaintiff appears to argue that St. Paul should be required to pay all defense costs because even by its own admission no apportionment is possible. However, because Subsection V.E. of the St. Paul Policy expressly provides for a situation where no apportionment agreement is possible, St. Paul's acknowledgment that apportionment determinations are difficult merely supports its position that it need only pay the percentage of Defense Costs it believes to be covered.